IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BOARD OF MANAGERS OF VAIL AVENUE CONDOMINIUM ASSOCIATION and VAIL AVENUE CONDOMINIUM ASSOCIATION, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.: 06 CV 2098 |
| THE TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, | ) ) ) | Judge James F. Holderman |
| Defendant. | ) ) | |

**PLAINTIFFS' LOCAL GENERAL RULE 56.1(a)(3)
STATEMENT OF MATERIAL FACTS**

**The Parties**

1. Plaintiff, Vail Street Condominium Association, a duly organized and licensed Illinois not-for-profit corporation in good standing, having its principal place of business in the Village of Arlington Heights, Illinois, is the governing body of the Vail Street Condominium Association ("the Association"), a seven-story residential condominium development ("the building", "the Vail building", "the insured building" or "the insured premises") which was established by the Declaration for the Association ("the Declaration") (Complaint (¶1) (Appendix Exhibit A); Answer (¶1) (Appendix Exhibit B)).

2. The Association was formed as a not-for-profit corporation to be the governing body for the direction and administration of the insured premises. Pursuant to Section 18.4 of the Illinois Condominium Property Act (the "Act") (765 ILCS 605/18.4), the Board of Managers shall exercise for the Association all powers, duties and authority vested in the Association by the Act and the Declaration (Complaint (¶2); Answer (¶2)).

3. Plaintiff, the Board of Managers of the Association ("the Board"), is the duly elected and qualified board of managers described in the aforesaid Declaration (Complaint (¶3); Answer (¶3)).

4. Section 9.1(b) of the Act (756 ILCS 605/9.1(b)) states that "[t]he board of managers shall have standing and capacity to act in a representative capacity in relation to matters involving the common elements or more than one unit on behalf of the unit owners, as their interest may appear."[1] (Complaint (¶ 4); Answer (¶4)).

5. Curt Yearwood is the Vail President. Mr. Yearwood is a principal of Alpha Adjusting Co., Inc., a public insurance adjusting firm who represent policyholders in the preparation and negotiation of first-party property insurance claims. Mr. Yearwood has been employed in the insurance industry since 1974 (Curt Yearwood Deposition ("Dep.") Transcript ("Tr.") at pp. 7-8, 14 (Appendix Exhibit C)).

6. Defendant, Travelers Indemnity Company of Connecticut ("Travelers"), is a citizen of a State other than Illinois, having its principle place of business in Hartford, Connecticut, and is engaged in the business of underwriting and issuing Condominium PAC insurance policies (Complaint (¶5); Answer (¶5)).

**Jurisdiction**

7. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1332, inasmuch as Travelers timely filed its notice of removal and complete diversity and an amount in controversy in excess of $75,000 exists (The Court's June 1, 2006 order (Appendix Exhibit D)).

---

[1] The Association and/or the Board are hereinafter referred to in this Statement as "Vail".

**Insurance Coverage**

8. Travelers issued to Vail a renewal Condominium PAC insurance policy effective August 11, 2003 until August 11, 2004 ("the policy" or "the Travelers policy"), in which Travelers agreed to pay Vail for direct physical loss of or damage to the insured building unless such loss or damage was limited or excluded under the policy (Complaint (¶¶ 6 and 7); Answer (¶¶ 6 and 7)).

9. A true and accurate copy of the Travelers insurance policy is contained in Appendix Exhibit F (John Harmon Dep. Tr. at pp. 24-25 (Appendix Exhibit E); Harmon Dep. Exhibit ("Ex.") 11 (Appendix Exhibit F)).

10. One of the forms which comprise the Travelers policy is the 28-page MP T1 02 01 00 Form ("Form MP T1") (Harmon Dep. Tr. at pp. 27-29; Harmon Dep. Ex. 11).

11. The policy "insuring agreement" is set forth in Section A of Form MP T1 (pages 1 through 14) (Harmon Dep. Tr. at pp. 29-34; Appendix Exhibit G).

12. The policy contains three separate groups of exclusions (B.1., B.2., and B.3.) which are set forth in Section B of Form MP T1 (pages 14 through 18) (Harmon Dep. Tr. at pp. 30-34; Harmon Dep. Ex. 16 (Appendix Exhibit H)).

13. The lead-in language to the B.1. exclusions (B.1.a through B.1.i) provides as follows:

> "1. We will not pay for loss or damage caused directly or indirectly by any of the following. *Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.*" (Emphasis added.)
> (Harmon Dep. Tr. at p. 34; Harmon Dep. Ex. 16).

14. The lead-in language to the B.2. exclusions (B.2.a through B.2.p.) provides as follows:

123374.1

3

      "2.    We will not pay for loss or damage caused by or resulting from any of the following:" (Harmon Dep. Tr. at p. 34; Dep. Ex. 16).

15.    The lead-in language to the B.3. exclusions (B.3.a through B.3.c.) provides as follows:

      "3.    We will not pay for the loss or damage caused by or resulting form any of the following, but if an excluded cause of loss that is listed in 3.a. through 3.c. below results in a Covered Cause of Loss, we will pay for the loss or damage caused by the Covered Cause of Loss." (Harmon Dep. Tr. at p. 34; Harmon Dep. Ex. 16).

16.    The lead-in language to the B.1. exclusions is different than the lead-in language to the B.2. and the B.3. exclusions (Harmon Dep. Tr. at p. 34).

17.    Exclusions B.2.d.(7)(a) and B.2.d(7)(b) provide as follows:

"We will not pay for loss or damage caused by or resulting from any of the following:

                  \*   \*   \*   \*

    d.(7)    The following causes of loss to personal property:

        (a)    Dampness or dryness of atmosphere;
        (b)    Changes in or extremes of temperature;" (Harmon Dep. Tr. at pp. 34-35; Harmon Dep. Ex. 16).

18.    There is no exclusion in the Travelers policy for loss or damage to a building caused by or resulting from dampness or dryness of atmosphere or changes in or extremes of temperature (Harmon Dep. Tr. at pp. 34-35).

19.    All three parts (a., b., and c.) of the B.3. exclusions contain an express exception, such that if one of these excluded perils results in a covered cause of loss, coverage applies to the resulting loss or damage (Harmon Dep. Tr. at pp. 34-37).

20. Wind damage is a covered cause of loss under the Travelers policy (Harmon Dep. Tr. at pp. 44, 60).

## The Insured Building

21. The insured building is a seven-story, concrete-framed structure that contains parking within the basement, commercial spaces at the first floor level, residential units at the 2nd through 7th floor levels, and a mechanical penthouse atop the center portion of the roof (Brian Blodgett Dep. Tr. at p. 30 (Appendix Exhibit I); (Blodgett Dep. Exs. 7 and 8 (Appendix Exhibit J); Harry Allen Dep. Tr. at pp. 13, 29 (Appendix Exhibit K); Harry Allen Dep. Exs. 1 and 3 (Appendix Exhibit L)).

## The Roof System

22. A roof system is a system of interacting roof components, generally consisting of a membrane or primary roof covering and roof insulation (not including the roof deck) designed to weatherproof and, sometimes, to improve the building's thermal resistance (Blodgett Dep. Tr. at p. 26; Blodgett Dep. Ex. 5 (Appendix Exhibit M)).

23. A membrane is a flexible or semi-flexible roof covering or waterproofing whose primary function is to exclude water (Blodgett Dep. Tr. at p. 26; Blodgett Dep. Ex. 5).

24. A roof covering is the exterior roof cover or skin of the roof system, consisting of membrane, panels, sheets, shingles, tiles, etc. (Blodgett Dep. Tr. at p. 26; Blodgett Dep. Ex. 5).

25. The insured building is covered with a combination of low-slope and steep-slope roof systems. There are three (3) rectangular low-slope sections that are located at the center of the building. They are protected with a ballasted, EPDM (rubber) covering (Allen Dep. Ex. 3; Larry Meyers Dep. Tr. at pp. 5, 10 (Appendix Exhibit N); Larry Meyers Dep. Exs. 2 and 6 (Appendix Exhibit O)).

26. The steep-slope portions of the roof border the entire building in a large "mansard" fashion. They consist of multiple fields connected at hips, valleys and ridges. The roof covering for the steep-slope fields is an asphalt shingle applied over a 30lb felt underlayment. An "ice and water shield" was utilized in lieu of felt underlayment along all eaves, valleys and transition locations. Periodically spaced dormers that are covered with standing seam metal roof systems break up the steep slopes. The steep-slope sections are also characterized by skylights and miscellaneous other penetrations. The base of each slope has been equipped with a snow fence. Drainage is to gutter and downspouts along each eave. Ventilation is accomplished by means of spaced soffit ridge or louver wall vents (Allen Dep. Ex. 3; Meyers Dep. Ex. 6).

### Hatteras Asphalt Shingles

27. The asphalt shingles covering the steep-slope portions of the roof are the "Hatteras" four-tab shingles manufactured by CertainTeed Corporation (Blodgett Dep. Tr. at pp. 30-33).

28. The Hatteras four-tab asphalt shingle is comprised of a single layer of fiberglass mat, impregnated and coated with asphalt on both sides, and surfaced with mineral roofing granules on the weather side and a mineral release agent on the back side. The shingles are self-sealing by means of adhesive strips located on either the weather side or the underside (Blodgett Dep. Tr. at pp. 26-33; Boldgett Dep. Ex. 6 (Appendix Exhibit J); Louis Juhlmann Dep. Exs. 16, 17 and 18).

### The Roof Deck

29. A roof deck is the structural component of the roof of a building (Blodgett Dep. Ex. 5; Meyers Dep. Tr. at pp. 28-29).

30. The Hatteras asphalt shingles are fastened into a plywood sheathing deck. The ¾" thick 4' x 8' plywood sheathing panels are supported by 1" lightgage metal hat channels spaced approximately 24" o.c. and spanning perpendicular to the roof slope. The lightgage metal hat channels are supported by 10" deep lightgage metal channels spanning parallel to the roof slope and spaced approximately 16" o.c. There is a layer of 6" thick batt insulation running between the lower portions of the lightgage metal channels (roof rafters) and a polyethylene sheet along the underside of the roof joists and batt insulation. There are two layers of ⅝" thick gypsum board below the polyethylene sheet (Allen Dep. Ex. 3; Meyers Dep. Ex. 6; Meyers Dep. Tr. at p. 51).

31. The Hatteras asphalt shingles are designed to lay flat over the underlying course without any visible gaps between courses (Blodgett Dep. Tr. at pp. 33.34; Yearwood Dep. Tr. at p. 61; Meyers Dep. Tr. at p. 49).

32. Standard roofing practice requires an asphalt shingle like the Hatteras shingles to be fastened to a clean, smooth, non-delaminated, and undamaged roof deck (Blodgett Dep. Tr. at pp. 59-60; Juhlmann Dep. Tr. at p. 61; Meyers Dep. Tr. at p. 44).

33. Standard roofing practice precludes fastening asphalt shingles like the Hatteras shingles to a warped, bowed, buckled, or cupped plywood roof deck (Blodgett Dep. Tr. at pp. 59-60; Juhlmann Dep. Tr. at pp. 61-61; Allen Dep. Tr. at p. 101).

34. Fastening a replacement asphalt shingle like the Hatteras shingle to a warped bowed, buckled, or cupped plywood roof deck would be contrary to standard roofing practice (Blodgett Dep. Tr. at pp. 59-60).

35. Fastening a replacement asphalt shingle like the Hatteras shingle to a warped, bowed, buckled, or cupped plywood roof deck would void the CertainTeed warranty for the Hatteras shingle (Blodgett Dep. Tr. at pp. 29-30, 60-61).

**The Insurance Claim**

36. On or about May 30, 2004, it was brought to Vail's attention by one of the condominium unit owners that shingle tabs had blown off from one of the steep-slope roof elevations (Yearwood Dep. Tr. at p. 65).

37. Vail reported the loss to Travelers on June 1, 2004, at which time a wind damage claim was opened (Harmon Dep. Tr. at pp. 17, 44-46; Harmon Dep. Ex. 3 (Appendix Exhibit Q)).

38. On June 4, 2004, Travelers claim representative Steve Howland inspected the insured building with Curt Yearwood, the Association President (Harmon Dep. Tr. at pp. 49-50; Harmon Dep. Ex. 3).

39. Howland and Mr. Yearwood observed from street level several missing shingle tabs and several lifted shingle tabs during this inspection (Harmon Dep. Tr. at pp. 49-50; Harmon Dep. Ex. 3; Yearwood Dep. Tr. at p. 66).

40. On June 25, 2004, Travelers claim representative John Parris inspected the roofs of the insured building along with Mr. Yearwood, two representatives from James Mansfield & Sons Company, Inc., the entity who installed the steep-slope roof system, and Louis Juhlmann of Roofing Consultants, Ltd., who Travelers had retained to determine the cause and extent of the steep-slope roof damage (Harmon Dep. Ex. 3; Harmon Dep. Tr. at pp. 56-58; Louis Juhlmann Dep. Tr. at pp. 10, 43-45 (Appendix Exhibit T)).

41. In addition to missing and lifted shingles tabs, "ridging" of shingles and "buckling" of plywood sheathing roof decking (i.e., an upward, tenting, displacement of the shingle and the plywood) was observed throughout most of the steep-slope roof elevations during this inspection (Harmon Dep. Ex. 3; Yearwood Dep. Tr. at p. 67; Juhlmann Dep. Tr. at pp. 59, 64-66, 75-76).

42. On July 28, 2004, the following notes were entered into the Vail claim activity log by Anna Ramirez, a Travelers claim supervisor:

> "I reviewed the roofing engineer's report. It does confirm some wind damage, with subro[gation] potential against either the shingle manufacturer and/or the roofer, Mansfield Roofing. We have an idea of the quantity of shingles affected, but the engineer says a more thorough investigation of the entire roof will be requested to establish more accurate numbers. Right now, we have 1½ bundles of torn shingles and no more than two per square of unsealed shingles tabs.
>
> Since we potentially have a subrogation action against Mansfield, and as the roofing installer, their opinion will be biased. We need an independent roofer to assist in determining the exact quantity and cost of repairs. This independent roofer should go out and estimate with Mansfield and the engineer so everyone is in agreement. I understand that the big issue is the roof's accessibility and steep slopes, and that is why an adjuster cannot be the one to determine repair costs." (Harmon Dep. Ex. 3; Harmon Dep. Tr. at pp. 10-12, 54, 59-63).

43. On February 10, 2005, Travelers claim representative John Harmon, who was assigned the Vail claim as of June 8, 2004 and who never saw the insured building in person, closed the Vail claim without payment, allegedly because Mr. Yearwood told him to (Harmon Dep. Tr. at pp. 16-17, 52, 67-68).

44. Mr. Yearwood denies having this conversation with Harmon (Curt Yearwood Affidavit (Appendix Exhibit R).

123374.1                                    9

45. Although it agreed to do so, Travelers never obtained a roofing contractor to estimate the cost to repair/replace the loss and damage to the shingles prior to the claim being closed (Harmon Dep. Tr. at pp. 52-53 62-66; Yearwood Dep. Tr. at pp. 78-79).

### The Lawsuit

46. On March 17, 2006, Vail filed suit in the circuit court of Cook County against Travelers for breach of insurance contract and violation of section 155 of the Illinois Insurance Code (Appendix Exhibit A).

47. On April 14, 2006, Travelers, invoking this court's jurisdiction pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1332, filed a notice removing Vail's state court complaint from the circuit court of Cook County (Appendix Exhibit S).

48. On May 12, 2006, Vail filed its answer to the complaint and asserted various affirmative defenses, including that Vail's loss was excluded under the policy (Appendix Exhibit B).

### Roof Inspections Subsequent To Filing Of Suit

49. On October 10, 2006 and January 25, 2007, Harry Allen, a licensed structural engineer in the State of Illinois, inspected the roofs of the building at the request of Curt Yearwood to determine the cause of the roof damage (Allen Dep. Tr. at pp. 13, 22-23; Allen Dep. Exs. 1 and 3).

50. During his inspections, Allen observed missing and lifted shingle tabs throughout the steep-slope roof elevations (Allen Dep. Tr. at pp. 48-49, 113-119).

51. During his inspections, Allen also observed shingles ridging on every steep-slope roof elevation (Allen Dep. Tr. at pp. 33-34, 47).

52. On November 20, 2006 and December 27, 2006, Larry Meyers, a licensed structural engineer in the State of Illinois, inspected the roofs of the building at the request of Travelers' counsel to opine on the condition of the shingles and causes for shingle ridging (Meyers Dep. Tr. at pp. 5, 9-10, 22, 26; Meyers Dep. Exs. 2 and 6).

53. During his inspections, Meyers observed missing and lifted shingles tabs throughout the steep-slope roof elevations (Meyers Dep. Tr. at pp. 45-46, 50; Meyers Dep. Ex. 6).

54. During his inspections, Meyers also observed shingle ridging, which he defined as a rise in the shingles from a relatively flat position or an upward, tenting, displacement of a shingle (Meyers Dep. Tr. at pp. 28, 30, 36-40; Meyers Dep. Ex. 6).

55. On December 27, 2006, Brian Blodgett, a licensed roofing contractor with 15-years of experience in the roofing industry, at the request of Louis Julhmann, inspected the roofs of the building in order to prepare an estimate to repair/replace missing and cracked shingle tabs (Blodgett Dep. Tr. at pp. 13-15, 18, 24, 41-45, 62-65).

56. During his inspection, Blodgett observed missing shingle tabs throughout the steep-sloop roof elevations (Blodgett Dep. Tr. at pp. 43-44).

57. During his inspection, Blodgett also observed throughout the steep-slope roof elevations ridging of shingles spanning two (2) to four (4) feet both vertically and horizontally to the slope of the roof (Blodgett Dep. Tr. at pp. 48-50).

58. Following his inspection, Blodgett prepared an estimate to repair/replace 200 square feet of missing and cracked shingle tabs (Blodgett Dep. Tr. at pp. 62-69, 71-72).

**Missing And Lifted Shingle Tabs**

59. Five nails are required per shingle for fastening to the roof deck. Missing shingles tabs expose one or more of the nails. Exposed nails can act as a conduit for water infiltration, thus posing a risk of physical loss or damage (Blodgett Dep. Tr. at pp. 46-48; Harmon Dep. Tr. at pp. 30-32; Juhlmann Dep. Tr. at pp. 68-70; Allen Dep. Tr. at p. 52; Meyers Dep. Tr. at pp. 31, 47-48).

60. A lifted Hatteras shingles tab can reduce the service life of the shingle as well as affect the wind resistance and drainage plane of the roof, thus posing a risk of physical loss or damage (Blodgett Dep. Tr. at pp. 69-70; Yearwood Dep. Tr. at pp. 155-156; Harmon Dep. Tr. at pp. 30-32; Allen Dep. Tr. at pp. 115-116).

61. Wind is a cause of the missing and lifted tabs existing throughout the steep-slope roof elevations (Juhlmann Dep. Tr. at pp. 66-67; Allen Dep. Tr. at p. 86; Meyers Dep. Tr. at pp. 44-47).

**Ridging Of Shingles**

62. The ½" to 3" upward, tenting, displacement or ridging of the Hatteras shingles, which has bent, stressed, and strained them, is a distinct, demonstrable, and physical alteration and deformation of the shingles (Blodgett Dep. Tr. at pp. 48-52; Juhlmann Dep. Tr. at pp. 59-60; Allen Dep. Tr. at pp. 33-34, 42, 85-87, 90; Meyers Dep. Tr. at pp. 57-64, 67, 75, 79-82).

63. Ridged shingles are in a condition other than which they were designed and intended for use (Blodgett Dep. Tr. at p. 51; Meyers Dep. Tr. at pp. 67, 75).

64. The ridging of the Hatteras shingles is a permanent condition (Yearwood Dep. Tr. at pp. 155-157; Juhlmann Dep. Tr. at pp. 102-104; Allen Dep. Tr. at pp. 106-107, 119-120; Meyers Dep. Tr. at pp. 63-64, 75).

65. Ridging of an asphalt shingle like the Hatteras shingle can reduce the service life of the shingle, which may crack along the stressed, buckled, or ridged area, as well as affect the wind resistance and drainage plane of the roof, thus posing a risk of physical loss or damage (Blodgett Dep. Tr. at pp. 52-59, 70; Yearwood Dep. Tr. at pp. 155-156; Harmon Dep. Tr. at pp. 30-32; Allen Dep. Tr. at pp. 88-92, 99-102, 114, 118-120; Meyers Dep. Tr. at pp. 63-67).

### Cause Of Shingle Ridging And Plywood Deck Buckling

66. As reflected in his November 3, 2006 report, it is Mr. Allen's opinion that the shingle ridging is indicative of the plywood sheathing roof decking buckling upward at the joints between the plywood sheathing panels. It also is his opinion that the cause of the buckling is a combination of the expansion of the plywood occurring when the moisture content of the plywood and the temperature increases or the greater contraction of the steel support system for the plywood when the temperature decreases *and* inadequate gaps left between the adjacent plywood panels to allow for the plywood to expand. Finally, it is his opinion that physical damage to the shingles has ensued or resulted from the buckling and lifting of the plywood sheathing (Allen Dep. Tr. at pp. 23, 85-87, 118-120; Allen Dep. Ex. 3).

67. As reflected in his December 29, 2006 report, it is Meyers opinion that the shingle ridging has occurred as a result of curing or warping of the edges of the plywood sheathing and/or wrinkling of the felt underlayment due to moisture conditions within the cavity space below the plywood sheathing. It also is his opinion that there are a number of causes contributing to this moisture condition, including changing moisture content in the plywood sheathing caused by changes in temperature and humidity (Meyers Dep. Tr. at pp. 41-42, 84-86; Meyers Dep. Ex. 6).

        Respectfully submitted,

By:   **/s/Edward Eshoo, Jr.**
_____
One of the attorneys for Plaintiffs

Edward Eshoo, Jr.
Christina M. Phillips
Childress Duffy Goldblatt, Ltd.
515 North State Street, Suite 2200
Chicago, IL 60610
(312) 494-0200