**Page 1**

```
1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION
3
  BOARD OF MANAGERS OF VAIL    )
4 AVENUE CONDOMINIUM           )
  ASSOCIATION, and VAIL        ) No. 06 CV 2098
5 AVENUE CONDOMINIUM           )
  ASSOCIATION,                 )
6        Plaintiffs,           )
  vs.                          )
7 THE TRAVELERS INDEMNITY      )
  COMPANY OF CONNECTICUT,      )
8        Defendant.
9
10       The deposition of LOUIS JUHLMANN, called
11 for examination pursuant to the Rules of Civil
12 Procedure for the United States District Courts
13 pertaining to the taking of depositions, taken
14 before Laura M. O'Brien, a notary public within and
15 for the County of Cook and State of Illinois, at
16 515 North State Street, Chicago, Illinois, on the
17 6th day of February, 2007, at the hour of
18 1:30 p.m.
19
20
21
22
   Reported by: Laura M. O'Brien, CSR
23 License No.: 084-004259
24
                                              1
```

ORIGINAL

**Page 2**

```
1 APPEARANCES:
  CHILDRESS DUFFY GOLDBLATT, LTD.,
2 BY: MR. EDWARD ESHOO
  515 North State Street, Suite 2200
3 Chicago, Illinois 60610
  (312) 494-0200
4
       Representing the Plaintiff;
5
6 FORAN GLENNON PALANDECH & PONZI, P.C.
  BY: MR. THOMAS B. ORLANDO
7 150 South Wacker Drive, Suite 1100
  Chicago, Illinois 60606
8 (312) 863-5000
9      Representing the Defendant.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                              2
```

**Page 3**

```
1                 I N D E X
2 WITNESS          DX  CX  RDX  RCX
3 LOUIS JUHLMANN
4    By Mr. Eshoo      4
5
6
7           E X H I B I T S
8 JUHLMANN
  DEPOSITION EXHIBIT        MARKED FOR ID
9
10 Nos. 1-22                      4
   Nos. 23-25                     6
11
   Note: Exhibits not tendered for inclusion
12
       into deposition transcript.
13
14
15
16
17
18
19
20
21
22
23
24
                                              3
```

**Page 4**

```
1      (Whereupon Juhlmann Deposition
2       Exhibit Nos. 1-22 were marked
3       for identification, LMO.)
4      (Witness duly sworn.)
5          LOUIS JUHLMANN,
6 called as a witness herein, having been
7 first duly sworn, was examined and testified
8 as follows:
9          DIRECT EXAMINATION
10 BY MR. ESHOO:
11    Q.  Please state your full name and spell it
12 for the record.
13    A.  L-O-U-I-S, J-U-H-L-M-A-N-N.
14    MR. ESHOO:  Let the record reflect this is the
15 deposition of Louis Juhlmann taken pursuant to
16 notice and set for today's date by agreement of the
17 witness and the parties' respective counsel.
18 BY MR. ESHOO:
19    Q.  Mr. Juhlmann, what did you do in
20 preparation for your deposition today?
21    A.  What did I do in preparation, reviewed my
22 reports, basically.
23    Q.  That would be what we've marked as
24 Exhibits 2 and 4?
                                              4
```

1 (Pages 1 to 4)

1    A. Correct.

2    Q. And attached to your first report, which

3 has been marked as Exhibit Number 2, were various

4 photographs that you took?

5    A. Yes.

6    Q. And I think 12 of them, 12 photographs?

7    A. Yes.

8    Q. All I did for convenience sake is

9 identified as Exhibit Number 3 the 12 photographs

10 that you took.

11    A. Okay.

12    Q. When did you review your two reports in

13 preparation for your deposition?

14    A. I read them this morning.

15    Q. Did you do anything prior to this morning

16 in preparation for your deposition?

17    A. Well, the second report is really not much

18 more than a month old, so the case is fairly fresh

19 in my mind.

20    Q. I appreciate that, but my question was

21 pretty specific.

22       Did you do anything in preparation for

23 your deposition prior to this morning?

24    A. I was asked to put together my files. I

5

1 did that, and I read the reports this morning.

2    Q. And you brought your file with you today?

3    A. Yes, I did.

4    Q. Can I see it.

5    A. Sure.

6       This was the original file for the 2004

7 report. This is the recent file.

8    MR. ESHOO: I'm going to give you back the

9 original file for the first inspection. I'm going

10 to copy these pages and be back.

11       (Whereupon Juhlmann Deposition

12       Exhibit Nos. 23-25 were marked

13       for identification, LMO.)

14    MR. ESHOO: The photograph you E-mailed didn't

15 have photographs, the second one.

16    MR. ORLANDO: It didn't —

17    MR. ESHOO: As you can see, I don't have

18 photographs.

19    MR. ORLANDO: Did we mail you a copy?

20    MR. ESHOO: We never got the reports mailed.

21 In fact, I don't have color photos of Wiss Janey's

22 report, which, obviously, I want to see it before

23 tomorrow. Do you mind if I mark this here?

24    MR. ORLANDO: Do you have a color copier?

6

1    MR. ESHOO: Yeah, I think we do.

2    I'm going to come back to his second file in a

3 couple of seconds.

4 BY MR. ESHOO:

5    Q. Exhibit 4 is the second report with the

6 photographs attached?

7    A. Okay.

8    Q. True?

9    A. True.

10    Q. Exhibit 26 is going to mark separately the

11 17 photographs that you took in November of 2006?

12    A. Yes.

13    Q. And Exhibits 23, 24 and 25 are documents

14 from your original file pertaining to the original

15 inspection you conducted in 2004?

16    A. Yes.

17    Q. 23 would be, basically, your setup sheet?

18    A. That's our claim form, yeah.

19    Q. And 25 would be your invoice for services

20 rendered?

21    A. Yes.

22    Q. In 2004?

23    A. Correct.

24    Q. And 24?

7

1    A. I believe that is, basically, a list of

2 the pages of the architect's plans that we wanted

3 to get copies of.

4    Q. Exhibit Number 1 is a notice for your

5 deposition. This has attached to it a rider for

6 documents. Have you brought with you today all

7 documents responsive to that rider?

8    A. I believe that I have gone through this

9 and brought everything that's in here, yes.

10    Q. Did you meet with Mr. Orlando or any other

11 attorney in his firm today in preparation for your

12 deposition?

13    A. Yes.

14    Q. When is the first time you had met

15 Mr. Orlando?

16    A. Today.

17    Q. Had you met any member of his firm prior

18 to today in connection with this matter?

19    A. I had met with Matt Ponzi.

20    Q. When did you meet him?

21    A. I met him the day which I did the second

22 inspection, which would have been — may I look at

23 this?

24    Q. Yes.

8

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

1  **A. November 20th, 2006.**
2   Q. What documents did you review with
3  Mr. Orlando today in preparation for your
4  deposition?
5   **A. Reviewed these reports.**
6   Q. Anything else?
7   **A. The items that would have been in my file.**
8  **Basically, it was the reports.**
9   Q. Were you shown any documents in
10 preparation for your deposition today other than
11 what is contained in your two files?
12  **A. No.**
13  Q. What is your date of birth?
14  **A. October 17, 1964.**
15  Q. Social Security number?
16  **A. 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.**
17  Q. Current residence?
18  **A. 2910 Cone View Lane in Waukesha,**
19 **Wisconsin.**
20  Q. Have you ever been convicted of a felony?
21  **A. No.**
22  Q. Have you ever been convicted of a
23 misdemeanor involving theft or dishonesty?
24  MR. ORLANDO: I want to go back. I did show

9

1  Wisconsin Department of Financial Institutions,
2  which reflects Roofing Consultants, Ltd. as a
3  Wisconsin corporation?
4   **A. I guess so, yes.**
5   Q. Who was the president of the corporation?
6   **A. I am.**
7   Q. How long have you been president for?
8   **A. Since March of 2005.**
9   Q. Who was the president prior to?
10  **A. Frank Balistreri, B-A-L-I-S-T-R-E-R-I.**
11  Q. What happened to him?
12  **A. I bought the company from him.**
13  Q. Did you hold an office in Roofing
14 Consultants, Ltd. between 1992 and 2005 when you
15 became president?
16  **A. At some point, I was given the title of**
17 **vice president.**
18  Q. Does Roofing Consultants, Ltd. do business
19 in any state other than Wisconsin?
20  **A. Yes.**
21  Q. What states?
22  **A. Illinois, Missouri, and Minnesota**
23 **primarily.**
24  Q. Exhibit No. 8 is a document we obtained

11

1  him the transition study. I don't know if that's
2  in your file or not. I showed him the picture from
3  this that we used at the other depositions. I
4  don't think that's in his file.
5  BY MR. ESHOO:
6   Q. What is Exhibit 5?
7   **A. It's my resume.**
8   Q. Is it current?
9   **A. Yes.**
10  Q. Did you obtain any post graduate degree
11 from Rutgers?
12  **A. No.**
13  Q. And you've been employed since 1982 by
14 Roofing Consultants, Ltd.?
15  **A. Correct.**
16  Q. What type of entity is that?
17  **A. It's a corporation.**
18  Q. What state is it incorporated in?
19  **A. Wisconsin.**
20  Q. Exhibit No. 6, is this the website?
21  **A. Yes.**
22  Q. Roofing Consultants, Ltd.?
23  **A. Yes, it is.**
24  Q. Exhibit No. 7, we obtained from the

10

1  from the Illinois Secretary of State, and it
2  reflects that the status of Roofing Consultants,
3  Ltd. was revoked at one point in time in the State
4  of Illinois. Are you aware of that Exhibit No. 8?
5   **A. Does it say when?**
6    **It says 1989. No, I'm not familiar with**
7  **that.**
8   Q. It reflects on Exhibit No. 9 from the
9  Illinois Secretary of State that Roofing
10 Consultants, Ltd. qualified here in the State of
11 Illinois to do business in 2002. Does that sound
12 about right?
13  **A. I'm sorry, what was the question?**
14  Q. According to that document, it reflects
15 that Roofing Consultants, Ltd. first became
16 qualified to do business here in the State of
17 Illinois in 2002; does that sound about right?
18  **A. I don't know. I was not the president at**
19 **the time.**
20  Q. Is there currently a natural office in
21 Illinois?
22  **A. We do not have a physical office in**
23 **Illinois, no.**
24  Q. Has Roofing Consultants, Ltd. ever had a

12

3  (Pages 9 to 12)

1    physical office here in the State of Illinois?
2         A.  At one time, we did have an office in
3    Skokie.
4         Q.  And what time frame was that?
5         A.  I would say mid 1990s.
6         Q.  When is the last time Roofing Consultants,
7    Ltd. had a physical office in the State of
8    Illinois?
9         A.  Sometime in the mid 1990s.
10        Q.  How many employees does Roofing
11   Consultants, Ltd. currently have?
12        A.  Six.
13        Q.  What are their names and positions?
14        A.  Well, besides myself, Brian Horvath, who
15   is a consultant
16        Q.  H-O-R-V-A-T-H?
17        A.  Yes.
18        Q.  Is he licensed or registered in any state
19   as either an architect --
20        A.  No.
21        Q.  Either architect, engineer, or structural
22   engineer?
23        A.  No.
24        Q.  And where does he live?
                                                    13

1         A.  Wisconsin.
2         Q.  Go ahead.
3         A.  Joseph Baldus, who is a field assistant.
4         Q.  Does he hold any license or registration
5    either as an architect, professional engineer, or
6    structural engineer?
7         A.  No.
8         Q.  Go ahead.
9         A.  Gregg Haut.
10        Q.  Does he hold any license or registration
11   either as an architect, professional engineer, or
12   structural engineer?
13        A.  No.
14        Q.  Where does Joseph Baldus live?
15        A.  Wisconsin.
16        Q.  Where does Gregg Haut live?
17        A.  Wisconsin.
18        Q.  Go ahead.
19        A.  Paul Dinkins.
20        Q.  Does he hold either a license or
21   registration as an architect, engineer, or
22   structural engineer?
23        A.  Yes.
24        Q.  What does he hold?
                                                    14

1         A.  He holds a structural engineer license and
2    an architect's license.
3         Q.  In what states?
4         A.  Wisconsin, Illinois, Minnesota, Missouri,
5    Iowa, Indiana, and, I believe, Michigan.
6         Q.  Where does he reside?
7         A.  Wisconsin.
8         Q.  How long has he been employed with the
9    company for?
10        A.  Almost two years.
11        Q.  So he was not employed at the time the
12   initial inspection was performed by Roofing
13   Consultants Limited of the Vail Avenue Condominium
14   in 2004?
15        A.  No, he was not.
16        Q.  Who else?
17        A.  Erica Weber, an administrative assistant.
18        Q.  She is also a Wisconsin resident?
19        A.  Yes.
20        Q.  Obviously, not registered or licensed
21   either as an architect, professional engineer, or
22   structural engineer?
23        A.  No.
24        Q.  Is that it in terms of the current
                                                    15

1    employees?
2         A.  Yes.
3         Q.  In June of 2004, were there any additional
4    employees of Roofing Consultants, Ltd. other than
5    the six people we've identified?
6         A.  Yes.
7         Q.  Who?
8         A.  Frank Balistreri.
9         Q.  Where did he live at the time?
10        A.  Wisconsin.
11        Q.  Did he hold either a license or
12   registration as an architect, professional
13   engineer, or structural engineer?
14        A.  Architect.
15        Q.  What state?
16        A.  Wisconsin, Illinois, Missouri. I believe
17   that's all.
18        Q.  Anybody else that was employed in June of
19   2004 by Roofing Consultants, Ltd. other than the
20   set of people that we've discussed?
21        A.  Edward Hable.
22        Q.  H-A-B-L-E?
23        A.  Yes.
24        Q.  Where does he reside?
                                                    16

4  (Pages 13 to 16)

1    A. Wisconsin.
2    Q. Where did he reside in 2004?
3    A. Wisconsin.
4    Q. Was he registered or licensed either as an
5    architect, professional engineer, or structural
6    engineer in June of 2004?
7    A. Professional engineer licensed in
8    Wisconsin, Illinois. He is licensed in multiple
9    states. I really don't recall them all for sure.
10   I know Wisconsin and Illinois for sure.
11   Q. Any other employees?
12   A. David Balistreri.
13   Q. And he resides in Wisconsin?
14   A. Yes.
15   Q. In 2004, did he hold any license or
16   registration either as an architect, professional
17   engineer, or structural engineer?
18   A. No.
19   Q. Any other employees in 2004, in particular
20   June of 2004?
21   A. I really don't recall.
22   Q. In June of 2004, Roofing Consultants, Ltd.
23   did not have a physical office here in the State of
24   Illinois, correct?

                                                    17

1    A. No.
2    Q. That's correct?
3    A. That's correct.
4    Q. Exhibits 10 and 11 are documents we
5    received from the Illinois Division of Professional
6    Regulation, and it reflects the licensing status of
7    Mr. Hable?
8    A. Uh-huh.
9    Q. Have you ever seen these documents or any
10   similar type document which depicts Mr. Hable's
11   credentials here in the State of Illinois?
12   A. I've never seen them, no.
13   Q. According to Exhibit No. 12, which is
14   another document we received from the Illinois
15   Division of Professional Regulation, Roofing
16   Consultants, Ltd. had a professional design firm
17   registration here in the State of Illinois. Were
18   you aware of that?
19   A. Yes.
20   Q. And it looks like it was not renewed as of
21   April 30, 2005 Does that sound about right?
22   A. I suppose. I really don't recall.
23   Q. When did Mr. Hable work for Roofing
24   Consultants, Ltd ; what was his tenure, from when

                                                    18

1    to when?
2    A. He started in the 1980s, I don't know
3    exactly when. And he, I believe, he worked up
4    until 2005.
5    Q. Was Mr. Hable a full-time employee of
6    Roofing Consultants, Ltd. up until 2005?
7    A. Yes.
8    Q. According to Exhibit No. 6, it says that
9    Roofing Consultants, Ltd. is licensed to perform
10   architecture or engineering services in Arizona,
11   Michigan, New York, Colorado, Minnesota, Oklahoma,
12   Missouri, Texas, Indiana, Nebraska and Wisconsin.
13   Illinois is none of those states listed,
14   correct?
15   A. I can look at it. I don't know.
16   Certainly, we are licensed. We have professionals
17   licensed in Illinois. This website, I can tell you
18   was just changed, because we currently don't have
19   -- my professionals aren't licensed in all of these
20   states. Maybe these are states Ed Hable used to be
21   licensed in.
22   Q. Well, if it was changed, it was changed in
23   the last 24 hours or so?
24   A. That is true, you could --

                                                    19

1    Q. This was printed up February 5th.
2    A. I'm not disputing that, but I can tell you
3    it's being commissioned to be changed. The whole
4    thing has been updated, so. . .
5    Q. You are not licensed or registered in the
6    State of Illinois as an architect, professional
7    engineer or structural engineer, are you?
8    A. No.
9    Q. Have you ever?
10   A. No.
11   Q. Are you entering any architectural
12   opinions in this case?
13   A. As a registered roof consultant, I am
14   rendering opinions, yes.
15   Q. Are you rendering opinions -- strike that
16   Are you rendering any architectural
17   opinions in this case?
18   A. I guess it depends on what you consider an
19   architectural opinion.
20   Q. What would you consider an architectural
21   opinion?
22   A. Well, I'm not offering any structural
23   opinions, but I guess I am offering opinions in
24   general construction terms, if that relates to

                                                    20

                                    5 (Pages 17 to 20)

1  architecture. I guess that depends on how you
2  define it.
3      Q. Are you rendering any engineering opinions
4  in this case?
5      A. No.
6      Q. But you may be rendering architectural
7  opinions in this case depending on how the term
8  architectural opinion is defined?
9      A. I suppose.
10     Q. Now, under your roofing experience as
11 reflected in Exhibit No. 5 of your curriculum
12 vitae, you list various duties, and there is like 6
13 different categories. And if you look at your
14 website materials, they seem to follow the
15 categories. Would that be fair?
16     A. That would be logical.
17     Q. So in terms of a more detailed
18 understanding of what roof and wall investigation
19 and analysis is as it relates to what you do, your
20 website would articulate the scope of that
21 function?
22     A. Yes.
23     Q. In terms of the roofing education portion
24 of your curriculum vitae, there are a number of

21

1      Q. And in that website, it reflects the
2  requirements to become certified?
3      A. I would assume that it would, yes.
4      Q. Basically, you have to have some level of
5  experience and pass a test?
6      A. You have to have, I believe, it's five
7  years of experience in roof consulting
8  specifically. You need to generate a certain
9  number of educational credits through various
10 classes that you have the option to take and then
11 you do have to pass an 8-hour exam.
12     Q. Did you pass that exam the first time?
13     A. It's a two-part exam. I passed the first
14 part the first time and the second part the second
15 time.
16     Q. What do you have to do to renew your — or
17 do you have to renew your certification yearly?
18     A. Yes, you have to renew it annually, which
19 requires a certain number of continuing education
20 credits each year.
21     Q. You indicate that from 1992 through 2006,
22 you've attended ongoing education classes,
23 seminars, and presentations by various trade
24 organizations, associations or manufacturers and

23

1  trade organizations and/or professional
2  associations listed. Do you belong to any of
3  those?
4      A. I belong to the Roof Consultants
5  Institute, which actually now goes strictly by the
6  term RCI Incorporated. May I look at it?
7      Q. I'm sorry. Sure. And?
8      A. And I belong to the National Roofing
9  Contractors Association, the NRCA.
10     Q. Are those the only two on that list?
11     A. That list that I'm an actual member of,
12 yes.
13     Q. How long have you been a member of the
14 National Roofing Contractors Association for?
15     A. I actually just joined that in the past
16 year.
17     Q. And how long have you been a member of the
18 roofing — I'm sorry, the Roof Consultants
19 Institute for?
20     A. I would estimate four years.
21     Q. Exhibit No. 15 is the website from the
22 Roof Consultants Institute. Have you had a chance
23 to look at that website?
24     A. I have, sure.

22

1  distributors. Have you had occasion to attend any
2  such education class, seminar or presentation by a
3  distributor or the actual company Certainteed?
4      A. I don't believe I've had an opportunity to
5  go to a Certainteed class; although, I've been to
6  courses by Airvent Incorporated, which I believe is
7  a Certainteed subsidiary.
8      Q. The 1994 education at the University of
9  Wisconsin, roofing analysis and design, was that a
10 class, seminar, what was it?
11     A. It was a class.
12     Q. Like a semester, you took a semester
13 class?
14     A. Right.
15     Q. In terms of the Roof Consultants
16 Institute, Advanced Roof Consulting, is that
17 various coursework or?
18     A. You'll notice there is a plus sign after
19 Advanced Roof Consulting. Advanced Roof Consulting
20 is one of the more advanced classes I've taken
21 through them, but I've taken I really don't know
22 how many. It's quite a few.
23     Q. During that 2001 to 2006 time frame?
24     A. Yes.

24

6  (Pages 21 to 24)

1   Q. Do any of these other associations or
2   trade organizations listed under the roofing
3   education portion of your curriculum vitae provide
4   a roofing certification similar to the RCI?
5   A. No.
6   Q. Your second and third page of the
7   curriculum vitae has what refers to the partial
8   client list?
9   A. Right.
10   Q. When you say client, what does that
11   entail?
12   A. These are customers for whom we've
13   provided roof consulting services, and everyone on
14   this list is someone that I have personally
15   handled.
16   Q. Under insurance companies is listed
17   St. Paul -- Traveler's Insurance. How many times
18   have you personally provided roofing for that
19   insurance company?
20   A. I don't know the numbers. It's been quite
21   a few.
22   Q. More than 50, less than 50?
23   A. Probably more than 50.
24   Q. More than 100, less than 100?

25

1   A. I would say less than 100.
2   Q. Somewhere between 50 and 100?
3   A. Yes.
4   Q. In terms of your fees, you're charging
5   $175 per hour for your time today?
6   A. Yes.
7   Q. The shingles involved in this particular
8   roof, the Hatteras shingle, where does that fall
9   within the residential roofing shingle or roof
10   covering listed on the second page of your C.V.?
11   A. That would fall under residential roofing
12   composition shingles.
13   Q. And the last page of your curriculum vitae
14   lists cases which you provided expert testimony
15   over the past four years?
16   A. Yes.
17   Q. Have any of those been in a Federal
18   District Court?
19   A. I don't think so.
20   Q. What states were those cases pending?
21   A. These are all Wisconsin.
22   Q. Have you ever testified in an Illinois
23   court of law at trial?
24   A. Yes, I have.

26

1   Q. How many times?
2   A. I believe three, four times, something
3   like that.
4   Q. And that would have been more than four
5   years ago?
6   A. When I put these down, these are the ones
7   that I could recall. I would have to go back and
8   look at my files to see when they would have been.
9   Q. How many times have you been deposed?
10   A. I don't know, maybe a dozen.
11   Q. How many times have you actually testified
12   at trial?
13   A. Maybe eight times.
14   Q. Just generally run down the list of the
15   six cases and tell me which party retained you,
16   plaintiff or defendant, and what was the nature of
17   your testimony?
18   A. The first one was Erie Insurance versus
19   Stacy Nelson. That was a simple hail damage claim.
20   I was representing Erie Insurance, that the kind of
21   information.
22   Amcov versus Watercraft Plumbing, Inc.
23   This was another case I was initially brought in by
24   the insurance company in this case, so I was

27

1   working for Amcov, and I assumed they were the
2   owner of the property, and that had to do with some
3   water damage.
4   Safro versus Master Builders, I was
5   representing Safro, they're a homeowner. And that
6   was a case involving some inhalation mold type
7   problems.
8   Acuity Insurance versus Bedford Court
9   Condominiums. I was hired by Acuity Insurance.
10   There was some failure of a plaza deck in that
11   case, and there was some dispute as to who was
12   responsible for that.
13   Kenneth Sullivan Company versus Kenneth
14   Keryluk. I was representing Kenneth Sullivan
15   Company who was the contractor in this case. And
16   because of some accusations made by the owner about
17   the way that they installed a plaza deck roof.
18   And Bernard Staller versus J&B
19   Construction Company. Bernard Staller was a
20   homeowner. I was representing the homeowner in
21   that case, because of some faulty installation
22   procedures on a wood shake roof system that J&B
23   Construction had installed.
24   Q. What was the damage caused by that faulty

28

7 (Pages 25 to 28)

1   construction?
2       A.   The last one that I mentioned?
3       Q.   Right.
4       A.   It was a wood shake roof installation that
5   had been installed with the improper type of
6   staples, and the staples were corroding and failing
7   and wood shakes were falling off.
8           May I ask for a glass of water.
9       Q.   Sure.
10          Have you had occasion to publish any paper
11  in the field of roofing consulting?
12      A.   I have written one or two articles for
13  newsletters. I wouldn't say they were papers that
14  were published.
15      Q.   Newsletters for whom?
16      A.   I believe I've written newsletters or
17  articles for newsletters for condominium trade
18  organizations.
19      Q.   Have you ever worked as or for a roofing
20  contractor?
21      A.   A roofing contractor?
22      Q.   Yeah.
23      A.   Yes, I have.
24      Q.   When?

29

1       A.   Well, one case comes to mind in it would
2   have been probably late 1990s where I was
3   representing a contractor on the installation of a
4   ballasted heat system.
5       Q.   Maybe I misunderstood — maybe you
6   misunderstood my question. I didn't mean work in
7   the sense of doing consulting services for. I
8   meant actually an employee of a roofing contractor?
9       A.   No, I've never worked for a contractor.
10      Q.   Have you ever designed a composition
11  shingled roof?
12      A.   Numerous times.
13      Q.   What allows you to design a composition
14  shingled roof without an engineer's or
15  architecture's license or registration?
16      A.   Well, I would suggest that the education
17  and training that I went through to become a
18  registered roof consultant probably gives me more
19  experience than the average architect or engineer
20  in that field. Having said that, we do have an
21  engineer on staff who does review everything that
22  we do.
23      Q.   And seals it?
24      A.   Correct.

30

1       Q.   Such as in this particular case, your
2   initial report was sealed by Mr. Hable?
3       A.   Correct.
4       Q.   But your second report was not sealed by a
5   professional engineer. Why not?
6       A.   In this case, I believe we wrote the
7   report and I don't think it was ever bound up
8   formally and sent out. It may have been, but in
9   this case, the report was written up and I think it
10  was just E-mailed out.
11      Q.   So no licensed professional engineer
12  reviewed your second report which has been marked
13  as Exhibit No. 4 prior to it being sent out?
14      A.   I don't think it was ever sent out. I
15  think Paul Dinkins, my engineer, did review it, but
16  has never been formally bound up and stamped.
17      Q.   But it's your testimony that all of the
18  reports that your company performs are reviewed and
19  sealed by a licensed or registered professional
20  engineer?
21      A.   It depends on the nature of the report,
22  but most of the time, that is the case.
23      Q.   And what is the reason for that, why do
24  you want to have a licensed professional engineer

31

1   review and seal the report?
2       A.   It's nothing that requires us to do so,
3   and, certainly, there is nothing structural about
4   most of these reports or the specifications.
5   However, there are people who do what we do who are
6   not licensed firms and it does give us a bit of a
7   competitive edge over them by being able to do so.
8       Q.   Well, would you agree that your Exhibit
9   Number 2, which is your first report in this matter
10  is a technical report which addresses and
11  establishes the standard of quality of materials
12  and workmanship concerning the roof at the Vail
13  Avenue Condominium, correct?
14      A.   I would agree it does that, but I don't
15  believe it really enters into any structural
16  issues.
17      Q.   That's not my question. My question was:
18  Would you agree that this is a technical report
19  which addresses and establishes the standard of
20  quality of materials and workmanship concerning the
21  roof at the Vail Avenue Condominium, correct?
22      A.   Yes.
23      Q.   You would agree that this, in essence, is
24  a forensic engineering report, your Exhibit No. 2?

32

1    MR. ORLANDO: Objection, vague, lack of
2  foundation.
3  BY MR. ESHOO:
4    Q. You can answer.
5    A. It's forensic in the sense that we are
6  assessing damage or alleged damage, but I don't
7  believe that it's an engineering report.
8    Q. Well, there are engineering opinions
9  rendered in this document, are there not?
10   A. I guess we can go back to determining what
11  you consider an engineering opinion. I don't think
12  there is anything in there that you would be
13  required to get an engineer to make an opinion of.
14   Q. Have you ever had occasion to apply
15  composition shingles to a roof deck?
16   A. I personally have never done it, no.
17   Q. Have you ever worked as an employee for a
18  manufacturer of roofing products?
19   A. No.
20   Q. Now, in this particular case, the shingles
21  were manufactured by the Certainteed Corporation;
22  is that your understanding?
23   A. That's my understanding.
24   Q. And what is the source of your
33

1  office, so I assume it was copied out of that.
2    Q. Are you familiar with the Hatteras
3  warranty?
4    A. Hatteras offers a 40-year warranty against
5  manufacturers' defects and a ten-year warranty
6  against wind damage up to 110 miles per hour.
7    Q. And the source of your understanding is
8  material from Hatteras or from Certainteed that
9  would be in that binder of materials from
10  Certainteed?
11   A. Yes.
12   Q. Are you familiar with what we've marked as
13  Exhibit No. 16, which is a technical data sheet for
14  the Hatteras shingle?
15   A. I am not familiar with this particular
16  document, but I have seen technical data sheets for
17  Certainteed before.
18   Q. For the Hatteras shingle?
19   A. I don't know if it was specifically for
20  Hatteras.
21   Q. Exhibits 19, 20, 21 and 22 are warranties
22  for the Certainteed asphalt shingle products for
23  the years 1997, 1998, 1999 and 2000. Is it your
24  understanding that the roof in question was
35

1  understanding in terms of that company being the
2  manufacturer of the shingles at issue; where do you
3  come up with that knowledge that that, in fact, was
4  the manufacturer of the shingles?
5    A. I don't recall whether that was
6  information that was provided to me. I am familiar
7  with the Hatteras shingle.
8    Q. Under what circumstances?
9    A. I am very familiar with Certainteed. I am
10  very familiar with their product line. I have
11  probably run into it on other projects; although,
12  it is not real common that I saw that.
13   Q. When is the first time you became familiar
14  with the Hatteras shingle?
15   A. I don't recall with Certainteed. I do
16  remember Certainteed coming out with it, but I
17  don't recall exactly when it was. I would estimate
18  it was in the '90s.
19   Q. Attached to your first report as Exhibit
20  A-1 is a document labeled "Application
21  Instructions: Hatteras Shingles"?
22   A. Correct.
23   Q. Where did you obtain the document from?
24   A. Well, I have Certainteed binders in my
34

1  installed during that time frame?
2    A. I believe so.
3    Q. Are you familiar with these warranties for
4  these four years?
5    A. I have probably seen them at some point,
6  but I certainly don't have them memorized.
7    Q. What other types of information do you
8  have in this Certainteed binder in your office?
9    A. It lists product data on all of the
10  products that they offer, as well as installation
11  instructions. I imagine there is some warranty
12  information and various other professional
13  materials.
14   Q. Is that the type of information that you
15  as a roofing consultant would customarily and
16  specifically review, consider and potentially rely
17  upon in rendering roofing consulting services?
18   A. It is certainly something that I would be
19  familiar with and it would play into that to some
20  degree, yes.
21   Q. Have you ever had occasion to speak with
22  any Certainteed representative about any of its
23  products, either specific to this case or any other
24  project?
36

9  (Pages 33 to 36)

A. I've spoken to Certainteed technical reps and sales reps.

Q. As it relates to this particular project or some other project?

A. I don't recall discussing this particular project with anyone.

Q. What would have been some of the reasons you had occasion to contact Certainteed representatives about?

A. I probably have contacted them in the past with questions regarding waranteed claims or technical questions, maybe a nontypical detail, probably talk to sales reps about getting samples.

Q. Exhibit No. 18 is an evaluation service report pertaining to Certainteed asphalt shingles. It was issued in 2005. Have you read any similar type of evaluation report on any Certainteed asphalt shingle product for compliance with the building codes? For example, Exhibit No. 18 is an evaluation to determine compliance with the 2003 international building code and 2003 international residential code and 1997 uniform building code.

A. I don't recall seeing that report, no.

Q. Have you seen similar types of reports

37

relative to Certainteed asphalt shingle products as it relates to compliance with the building codes?

A. Not that I can recall.

Q. Just a couple of quick questions about your two reports. Did you actually prepare both Exhibits 2 and 4?

A. Yes.

Q. Did anybody participate in the preparation? I mean, I understand that Mr. Hable may have reviewed Exhibit 2 and somebody else, some other registered or licensed professional engineer may have reviewed Exhibit No. 4. But other than those two people, did anybody else have any involvement relative to the preparation of these two reports?

A. Certainly, my administrative assistant.

Q. Anybody else?

A. I don't think there is any CAD drawings, so I don't think draftsman would have been involved. I don't belive so, but I don't recall.

Q. According to Exhibit Number 2, your first inspection of the Vail Avenue condominium complex was on June 25 of 2004?

A. Correct.

38

Q. And Exhibit Number 4 states original inspection May 22, 2004. That's wrong, correct?

A. Can I see them?

Q. Sure.

A. I assume that's a typo. It should be the same date for sure. Yeah, I don't know. Certainly, the original inspection was June 25th according to the report.

Q. So the second report marked as Exhibit Number 4 where it says original inspection May 22, 2004, that's an error?

A. Yes, it must be.

Q. Now, Exhibit 4 says, subsequent inspections November 20, 2006 and December 27, 2006. Did you actually go out to the property on both days?

A. Yes.

Q. We've seen photographs that you took on November 20 of 2006. Did you take any photographs during your December 27, 2006 inspection?

A. No.

Q. On your first report, Exhibit Number 2, under steep slope roof area, you have 33,600 square feet. That's the approximation, correct?

39

A. Correct.

Q. And what was, how did you come up with that approximation?

A. I would assume there is a roof plane in the back that we didn't take off of the plan.

Q. And then you get to your second report, Exhibit Number 4 another roof area, and you've got 38,000 I'm assuming square feet. What was the discrepancy between the two?

A. I believe that includes the terete.

Q. Now, you indicate on Exhibit Number 2 that the Hatteras shingle is a four strip tab?

A. That's correct.

Q. And if you look at Exhibit No. 16 in the upper right-hand corner, that purports to depict the Hatteras shingle with the four tabs, correct?

A. Correct.

Q. And Exhibit No. 17, is this another document taken from the Certainteed website, which is more or less a blowup of that four-tabbed shingle, correct?

A. Correct.

Q. And if we go to Exhibit No. 18, the ICC Evaluation Services, Inc. Report, under Figure 1,

40

1 there is a profile and fastener pattern for the
2 Hatteras shingle; do you see that?
3    A. Yes.
4    Q. And it looks like the length of the four
5 tab Hatteras shingle is 36 inches?
6    A. The width.
7    Q. I'm sorry, the width?
8    A. I believe that's true.
9    Q. And then I guess the length is 18 inches?
10   A. That's what it says.
11   Q. Is that your understanding from being out
12 in the field and observing, touching, seeing,
13 feeling?
14   A. I can tell you from being in the field
15 that I would assume it is approximately 18 inches.
16 By looking at the diagram, it says 18 inches, so I
17 would assume that is correct.
18   Q. If you look at Exhibit Number 17 above,
19 slightly above the middle, it looks like there is
20 two lines that have like dashes?
21   A. Yes.
22   Q. What is it?
23   A. The seal strips.
24   Q. Now, Exhibit Number 18, the left figure
                                     41

1 for the Hatteras shingle says, standard in high
2 wind nailing pattern five nails per shingle, and
3 then it looks like five going from left to right,
4 correct?
5    A. Correct.
6    Q. And then the next figure to the right of
7 it for Hatteras shingles, it says for roof slopes
8 greater than 21:12. What does that mean?
9    A. 21:12 is a slope. And, basically, that
10 means you've got 21 inches of rise over 12 inches
11 of run. That's a very steep mansard type design.
12   Q. And what was the slope of the nail on the
13 roof?
14   A. According to the architect's drawings,
15 it's a 10-inch and 12-inch.
16   Q. So it's less than the 21:12 slope?
17   A. Correct.
18   Q. On page 3 of your first report, you state
19 that Hatteras is a highly -- I'm sorry, Hatteras is
20 a high quality shingle with a unique design. They
21 are oversized (approximately 20 inches deep) and
22 five individual tabs. That's wrong, right, it
23 should be four?
24   A. I noticed that this morning. It should
                                     42

1 say four.
2    Q. In this particular case, you only
3 inspected the Vail Avenue Condominium roof on three
4 occasions?
5    A. Correct.
6    Q. The first time was June 25th of 2004?
7    A. I believe so, yes.
8    Q. Well, your report certainly says that?
9    A. That's right, June 25th.
10   Q. According to Exhibit No. 23, you being
11 Roofing Consultants, Ltd. received this particular
12 assignment on June 10 of 2004?
13   A. Yes.
14   Q. And that was a telephone call from John
15 Harman?
16   A. Yes.
17   Q. Prior to June 10 of 2004, did you know
18 Mr. Harman?
19   A. I don't believe so.
20   Q. Who filled out Exhibit Number 23?
21   A. It looks like my handwriting, but I don't
22 really recall.
23   Q. Where did you obtain the information in
24 order to fill out Exhibit 23, from whom?
                                     43

1    A. Provided by John Harman.
2    Q. Would this document have been prepared
3 contemporaneously with that telephone conversation?
4    A. Usually.
5    Q. Now, there is a reference to Matt Ponzi,
6 which we obviously know is a lawyer. So
7 John Harman told you on June 10 of 2004 that
8 Travelers already had a lawyer involved?
9    A. No. I am quite certain that Matt's name
10 was probably added to that at some point. Matt
11 must have contacted me or someone did. We must
12 have pulled the file out, and I wrote his name on
13 it. No, I didn't know Matt prior to the recent
14 involvement.
15   Q. Do you have an independent recollection of
16 the telephone conversation you had with Mr. Harman
17 on June 10 of 2004?
18   A. No.
19   Q. What did you understand to be your
20 assignment as of June 10, 2004?
21   A. We were asked to inspect the steep slope
22 portion of the roof and determine the extent of
23 wind damage and in all likelihood the costs.
24   Q. Did you send to Mr. Harman a formal
                                     44

1  retention agreement?
2     A. No.
3     Q. Did you do anything between June 10 of
4  2004 and June 25 of 2004 when you went out and did
5  your first inspection?
6     A. Well, we would have had to make the call
7  to the condominium association to schedule the
8  appointment, but that would probably be all.
9     Q. Were you provided with any documentation
10 from Mr. Harman before you went out?
11    A. I don't believe so, no.
12    Q. You weren't given a copy of the insurance
13 policy or anything like that?
14    A. No.
15    Q. But you knew there was an insurance claim
16 being made?
17    A. Of course.
18    Q. Have you ever seen any Travelers property
19 insurance policy during the course of your roofing
20 consulting profession?
21    A. I don't think so.
22    Q. Do you recall doing any independent
23 research before you went out to do your first
24 inspection?

45

1     then I directed him as to where I needed him to go,
2     what I needed him to look at. We focused on areas
3     of missing shingle tabs, areas where the roof
4     surface was buckled, and he did quite a bit of
5     random manual sampling to determine whether or not
6     any shingle tabs were unsealed, certainly took
7     pictures. I think we may have looked inside some
8     of the crawl spaced type areas behind the mansard.
9     That's essentially it.
10    Q. Did you maintain any notes during the
11    inspection?
12    A. Anything I have is in the file.
13    Q. Which one is that? That one, the first
14    one. I don't see any notes.
15    A. I can't tell you whether there was. If
16    there wasn't anything, it's not in there, but this
17    is everything that's in the file.
18    Q. What's your custom and practice when you
19    do an inspection?
20    A. I would typically have a clipboard with
21    me, and I would typically be taking some notes.
22    Q. What's your custom and practice once you
23    are done with your inspection?
24    A. Normally, I try to keep everything in the

47

1     A. No.
2     Q. How long were you at the property for on
3  June 25th?
4     A. I would assume it was a few hours.
5     Q. Do you know who was present?
6     A. It was a list on the report. I was
7  present. I had one assistant with me.
8     Q. That's Mr. Baldus?
9     A. Yes.
10    Q. There was a representative James Paris of
11 St. Paul Insurance. Kurt Yearwood, the on-site
12 insurance representative, insurance representative,
13 and it mentioned James Novacheck with Mansfield
14 Roofing. I believe he may have also had an
15 assistant. Had you ever met Kurt Yearwood prior to
16 June 5, 2004?
17    A. No.
18    Q. What did you do during your inspection on
19 June 25th?
20    A. We were provided with some historical
21 information from Kurt. Then we, basically, did a
22 visual inspection of the roof. Jay Novacheck of
23 Mansfield set up a fall protection system so he
24 could actually get down and inspect the roof. And

46

1     file. I can't say that things don't ever get lost,
2     but normally, I do.
3     Q. Were you provided with any documentation
4     during this inspection?
5     A. I don't recall exactly, but I believe Kurt
6     lent me a set of the architect's plans, and when I
7     was done reviewing them and we, obviously, made a
8     copy of the roof plan, I returned them to him.
9     Q. Your first report is dated July 2 of 2004.
10    Did you do anything between June 25 and July 2 of
11    2004 relative to this project other than prepare
12    the report?
13    A. No.
14    Q. Now, your second inspection was two years
15    later, November 20th of 2006. Who contacted you
16    and when to go back out and inspect a second time?
17    A. I was contacted by Tom Orlando and Matt
18    Ponzi regarding the fact that this case was
19    upcoming and we were going to be doing an
20    additional inspection.
21    MR. ESHOO: Let's take a quick break.
22       (Whereupon a short break
23        was taken, after which the
24        following proceedings were

48

12 (Pages 45 to 48)

1          had:)
2    BY MR. ESHOO:
3        Q.  You indicated that on your first
4    inspection in June of 2004, you took photographs,
5    correct?
6        A.  Correct.
7        Q.  And I think we've identified Exhibit
8    Number 3, the 12 photographs that you took?
9        A.  Yes.
10       Q.  That's it, only 12?
11       A.  There may have been more that weren't put
12   into the report, but I can tell you that that is
13   all I have.
14       Q.  And on November 20th of 2006, you took 17
15   photographs which have been marked as Exhibit 26?
16       A.  Correct.
17       Q.  You said you took no photographs during
18   your last inspection on December 27th of 2006?
19       A.  Correct.
20       Q.  What did Mr. Orlando explain to you in
21   terms of why you needed to go back out to the
22   property to do a second inspection?
23       A.  Well, the second one was really more a
24   visit than an inspection.  We met a roofing

                                              49

1    there were any changes.
2        Q.  How long were you out at the roof on
3    November 20th of 2006?
4        A.  I would say we were on-site approximately
5    an hour.
6        Q.  Who was present?
7        A.  Myself, Matt Ponzi, Larry Meyers with Wiss
8    Janey and Kurt Yearwood.
9        Q.  Do you have any notes from that
10   inspection?
11       A.  Everything was in the file.
12       Q.  Well, in your second file, I've marked as
13   Exhibit Number 29 a page of handwritten notes
14   Were those created in connection with your second
15   inspection or some other inspection?
16       A.  No.  That was the second inspection.
17       Q.  What's the gist of these notes?
18       A.  I was clarifying a couple of points,
19   because we were able to, I believe they opened up
20   some sections of the ceiling below the roof, and
21   then I just put a couple of notes as to what I
22   needed to put into a report.
23       Q.  Which was what?
24       A.  That my job was to write a report

                                              51

1    contractor out there so that we could have someone
2    put together a quotation to repair the roof.
3        Q.  That was KAP Roofing?
4        A.  Correct.
5        Q.  Who arranged to have KAP Roofing go out to
6    inspect the roof in November of 2006?
7        A.  I think it was December.
8        Q.  December.
9        A.  I arranged.
10       Q.  Well, I'm not on the third inspection yet.
11   The second inspection --
12       A.  I'm sorry.
13       Q.  -- you said Mr. Orlando requested you to
14   go out, right?
15       A.  Mr. Orlando and/or Mr. Ponzi.  I don't
16   recall.
17       Q.  So either Mr. Orlando or Mr. Ponzi told
18   you prior to November 20 of 2006, you need to go
19   out and look at the property a second time?
20       A.  Correct.
21       Q.  Did they explain why?
22       A.  Well, simply because it had been two years
23   since my original inspection, and we wanted to see,
24   basically, take another look through and see if

                                              50

1    assessing strictly the wind damage, warranty
2    issues, installation issues, refer back to my
3    original report as required, and the report we were
4    shooting for a December 18th completion date.
5        Q.  And the notes that you just read, those
6    were Mr. Orlando's or Mr Ponzi's instructions?
7        A.  Well, they were put together as part of a
8    discussion with Mr. Ponzi, yes.
9        Q.  Other than taking photographs, what else
10   do you do at the property on November 20th of 2006?
11       A.  As I mentioned, we did inspect the other
12   side of the deck where they had opened up some of
13   the ceiling, some of the drywall, and we also did a
14   visual inspection of some of the various places on
15   steep slope roof.  From the high point, we didn't
16   go down on it.
17       Q.  Did anybody walk the roof like -- and if
18   somebody did, do you remember the first time?
19       A.  No.
20       Q.  Were you provided with any documentation
21   at that second inspection?
22       A.  No.
23       Q.  Then you went out a third time on December
24   27th of 2006, correct?

                                              52

13  (Pages 49 to 52)

1    A. Correct.
2    Q. And what was the point of going out a
3 third time?
4    A. I was strictly meeting a contractor there
5 to show him the roof.
6    Q. Who directed you to do that?
7    A. That was also Mr. Ponzi.
8    Q. And basically, we wanted to get a contractor
9    A. Basically, we wanted to get a contractor
10 who could put together a hard cost associated with
11 necessary repairs to the roof as opposed to a rough
12 budget estimate.
13    Q. Were you ever directed by Mr. Ponzi or
14 Mr. Orlando to have a contractor go out and prepare
15 an estimate as to the cost to replace the entire
16 roof as opposed to limited repairs?
17    A. I was not directed to do that. If we
18 determined as part of that inspection a replacement
19 would be necessary, we would have put together a
20 proposal for a replacement. During the inspection,
21 we determined that it could be repaired, so that's
22 the direction we went.
23    Q. And then the basis that it could be
24 repaired was what?

53

1    A. We were specifically looking at wind
2 damage, dislodged shingle tabs, which are very
3 isolated, in such a small percentage of the roof
4 that it's certainly a repairable roof.
5    Q. Exhibit 27 is the estimate to perform
6 those repairs?
7    A. Correct.
8    Q. What is Exhibit Number 28?
9    A. This was a proposal that was going to take
10 quite a bit of time to put together. I was in no
11 position to guarantee KAP Roofing that they would
12 get the work or that it would be done, so I told
13 him he could bill us for his time, and that's his
14 invoice for his time.
15    Q. According to Exhibit Number 27, it says
16 upon inspection regarding the above mentioned
17 address, it was determined that the following
18 repairs were deemed necessary. Number one,
19 approximately 2?
20    A. I believe it says two squares.
21    Q. Two squares of shingle tabs are cracked
22 and/or missing. What is a square?
23    A. A square is a ten-by-ten area.
24    Q. So, basically, 200 square feet?

54

1    A. If you were to add up all the shingles
2 around the roof that we witnessed we were able to
3 determine were damaged, we felt the two squares of
4 roofing would be more than enough to cover that.
5 Essentially, a bundle of shingles a square.
6    Q. So one bundle of shingles equals
7 100 square feet?
8    A. That's correct.
9    Q. So if in this particular case relative to
10 this particular type of shingle, how many shingles
11 would equal a bundle?
12    A. Hatteras are a very unique size. I don't
13 know off the top of my head. I'd have to do the
14 math.
15    Q. Looks like it's 18 by 36 inches?
16    A. But you only take into account the exposed
17 portion, which is about 8 inches. So you've got --
18 well, I've probably got somewhere around 50
19 shingles in a bundle. That's just a rough
20 estimate.
21    Q. Let's do it this way. We've previously
22 marked as Exhibit Number 8 from Kurt Yearwood's
23 deposition a photograph which shows a missing tab?
24    A. Correct.

55

1    Q. So how was it visioned that this one
2 particular tab would be repaired?
3    A. The entire shingle that that tab was a
4 part of would be removed and replaced.
5    Q. So if we say that as an example, the two
6 tabs to the left and the one to the right, those
7 four tabs are a shingle, that shingle would be
8 replaced. What about any shingle above or below
9 it?
10    A. Well, we figured two squares. That took
11 into account there probably would be some shingles
12 that might possibly be damaged a part of the work.
13 However, that's going to be pretty minimal because
14 it's a very heavy weight shingles, and a contractor
15 that knows what he is doing ought to be able to
16 take one and put one in with minimal damage.
17    Q. Now, where it says on Exhibit 27,
18 approximately two squares of shingle tabs are
19 cracked and/or missing. Obviously, I understand
20 what missing means, because there is an example of
21 a missing shingle tab?
22    A. Uh-huh.
23    Q. The photograph marked as Exhibit Number 8
24 from Mr. Yearwood's deposition, what was meant by

56

14  (Pages 53 to 56)

1 the word "cracked"?

2   A. If a shingle had been partially torn or

3 lifted and not completely dislodged by wind, that's

4 what he is referring to.

5   Q. How long was Mr. -- is it Blodgett of KAP

6 Roofing present at the property for on December 27,

7 2006?

8   A. I would estimate an hour and a half.

9   Q. Who else was present?

10   A. I was present. Kurt Yearwood was present.

11 He let us up on the roof; although, I don't believe

12 he stayed around. And Larry Meyers of Wiss Janey

13 stepped out sort of independently, but we did see

14 him there at the inspection.

15   Q. Exhibit Number 30 is an E-mail from

16 yourself to Mr. Orlando dated April 13 of 2006,

17 which encloses your July 2, 2004 report. Why were

18 you sending that report to Mr. Orlando?

19   A. I assume he requested it. I don't recall.

20   Q. Exhibit 31 is an E-mail from Elizabeth

21 Musgrave to yourself dated November 8 of 2006. It

22 says I'm attaching plaintiff's expert documents in

23 above referenced case. After you've had a chance

24 to review these documents, please contact Tom

57

1 Orlando to discuss. Did you ever do that, contact

2 him to discuss those reports?

3   A. I'm sure that I did.

4   Q. Did you prepare any type of document

5 outlining your comments, what have you, pertaining

6 to those documents?

7   A. No.

8   Q. Did you ever discuss those reports with

9 Mr. Orlando?

10   A. I've had multiple discussions with

11 Mr. Orlando and Mr. Ponzi. I don't recall

12 specifically what -- I'm sure we did. I don't

13 recall specifically.

14   Q. Exhibit Number 32 is an E-mail from

15 yourself to -- I'm sorry, Mr. Orlando to yourself

16 dated January 30 of 2007. It says attached is

17 HKM's punchlist dated January 25, 2001. Items 8, 9

18 and 10 pertain to the roof, but we are trying to

19 figure out whether it pertains to the flat roof or

20 the tan shingled roof. Did you ever respond to

21 this E-mail and let Mr. Orlando know what you

22 thought?

23   A. I saw the E-mail. I did not respond,

24 because he sent it to both myself and Larry Meyers.

58

1 Larry responded before I did, so I didn't feel the

2 need to respond.

3   Q. How do you know Larry responded?

4   A. Because he copied me.

5   Q. What was the response?

6   A. Basically that those particular items

7 pertained to the steep slope roof.

8   Q. Now, during your first inspection in June

9 of 2004, you observed buckling or bulging of the

10 plywood panels at the panel joints?

11   A. Yes.

12   Q. And this buckling or bulging went for

13 several feet in a straight line both parallel and

14 perpendicular to the roof slope?

15   A. In some places, it was that long. I don't

16 think it was that long everywhere.

17   Q. But the buckling or bulging ran for some

18 distance in a straight line both parallel and

19 perpendicular to the roof slope?

20   A. Correct.

21   Q. And you observed this buckling or bulging

22 condition in all the sloped roof elevations during

23 your first inspection?

24   A. At various locations throughout the roof.

59

1 I don't know that every single field was affected,

2 but various locations, yes.

3   Q. And you observed this same condition on

4 your two subsequent inspections?

5   A. Yes.

6   Q. Did you observe any additional areas of

7 buckling or bulging that you did not observe on

8 your first inspection during your second and third

9 inspection?

10   A. There was really no appreciable

11 difference.

12   Q. When you were out there during your first

13 inspection, did you ask the people from Mansfield

14 who were actually walking the roof to determine the

15 height of this buckling or bulging?

16   A. No one measured it, no.

17   Q. Were you able to get close enough to

18 visually estimate the distance or height of the

19 buckling or bulging of any plywood panel?

20   A. Well, first, I have to clarify that we did

21 not open it up to confirm that it was the plywood

22 panel, but because of the way that the buckles

23 moved, because the ridgidity and because of the

24 fact that they ran a straight line was all

60

15 (Pages 57 to 60)

1 indications that it was the plywood.

2 Q. That's your opinion, right?

3 A. That's my opinion, yes. I would estimate

4 that they were probably at most about an inch

5 lifted.

6 Q. Do any of your photographs that you took

7 document the buckling or bulging condition of the

8 plywood panels, and, if so, refer to the exhibit

9 number and what particular photograph?

10 A. Exhibit 3, photographs number 8, 9, and 10

11 all show buckling. Exhibit 26, photos 11, 12, 13.

12 Q. Exhibit Number 2, your first report, we

13 talked about Exhibit A-1 being the application of

14 structures for the Hatteras shingles and Exhibit

15 16-B being a technical sheet for the Hatteras

16 shingles. Do either of these two documents address

17 what the condition of the roof deck is to be at the

18 time shingles are to be applied?

19 A. Well, the application instruction talks

20 about what the deck must be as far as thickness

21 goes.

22 Q. But do they specifically address what the

23 condition of the roof deck needs to be at the time

24 that the shingles are to be applied?

61

1 A. I'd have to reed through it, but it's very

2 possible they refer to it.

3 Q. Take a few moments if you need to.

4 Did you get a chance to look at those two

5 documents?

6 A. The only references I'm finding to the

7 deck has to do with the thickness and they should

8 conform to the APA.

9 Q. They should what?

10 A. Conform to the APA, the Engineered Wood

11 Association. If there is something else, I guess

12 I've missed it.

13 Q. Well, is it the standard practice in the

14 roofing industry that the roof deck be in a flat,

15 clean, and undamaged condition at the time shingles

16 are to be applied to it?

17 A. Yes.

18 Q. So you would agree that installing

19 shingles over a buckled or bulged roof deck would

20 be contrary to accepted standard practice in the

21 roofing industry?

22 A. Yes.

23 Q. Now, in this particular case, you said you

24 are familiar with the warranties that Hatteras —

62

1 A. I said, I don't have them memorized. I've

2 seen them.

3 Q. Take a look at the '97 through 2000

4 warranty for Certainteed products, including the

5 Hatteras shingle. And what I'd like to I guess

6 direct you to is the section in each of them under

7 limitations

8 A. Okay. And your question was?

9 Q. Well, first of all, look through all four

10 of those, '97 through 2000 and confirm that same

11 limitation is in all four of the warranties,

12 correct?

13 A. Very standard wording, yes.

14 Q. And the limitation is that this warranty

15 does not provide protection against damage caused

16 by situations and events beyond normal exposure

17 conditions, such as but not limited to distortion,

18 cracking, or other failure or movement of the base

19 material over which the shingles are applied or on

20 the roof deck Would you agree that this buckling

21 or bulging condition is such that the warranty

22 would not apply because of that condition?

23 A. The warranty would not apply from the

24 manufacturer's standpoint to that specific item.

63

1 But that does not — that's not the only issue on

2 this roof. There is also dislodged shingle tabs

3 that are completely unrelated to the deck

4 distortion, which may very well be covered by the

5 warranty.

6 Q. Well, dislodged shingles meaning missing

7 shingles?

8 A. Missing or torn.

9 Q. And, well, to the extent that you have --

10 well, let me ask you this

11 How many dislodged or missing or torn

12 shingles did you observe in locations where there

13 was no bulging or buckling of the plywood deck?

14 A. During either of our inspections, not a

15 single dislodged shingle tab corresponded with

16 buckling the deck.

17 Q. So it's your testimony based on your

18 observation that no missing, torn, or dislodged

19 shingle was in an area in which there was a buckled

20 or bulged plywood?

21 A. None of the dislodged shingle tabs that we

22 observed were at direct corresponding locations

23 with buckling.

24 Q. Interesting.

64

16 (Pages 61 to 64)

1    A. I think the pictures back that up.
2    Q. Both ways, I suspect.
3        Now, you indicated that -- let me ask you
4    this. The shingles would be considered a roof
5    covering?
6    A. They cover the roof, sure.
7    Q. And a roof covering is the covering
8    applied to the roof for weather resistance?
9    A. Yes.
10   Q. And would you agree that all roofs should
11   be covered with approved roof covering properly
12   secured to the building or structure to resist wind
13   and rain?
14   A. Yes.
15   Q. How many missing tabs did you observe
16   during your first inspection? By missing tabs, I'm
17   referring to the condition depicted in photographs
18   8 and 9 marked during Mr. Yearwood's?
19   A. Can I look at my original report. I may
20   have documented it.
21   Q. Sure.
22   A. During this inspection, we noted less than
23   20 tabs to be missing in the general field of the
24   roof and an additional ten tabs missing from the
                                                      65

1    northern most ridge vent.
2    Q. And you indicated that the 20 missing tabs
3    that you observed during your first inspection were
4    in what areas?
5    A. The general field of the roof.
6    Q. Meaning what?
7    A. They were just in the middle of the roof
8    as opposed to the rib tabs that I mentioned
9    separately.
10   Q. And photograph 12 of Exhibit Number 3
11   shows the missing tabs from the ridge vent?
12   A. Correct.
13   Q. But in terms of the less than 20, they
14   were in a general field of the roof, what
15   elevations?
16   A. I don't have that specifically documented.
17   My recollection was the majority were in the
18   western facing fields, but I know that there were
19   missing tabs in fields facing all directions.
20   Q. In terms of the missing shingles in the
21   general field of the roof that you observed during
22   your first inspection, were any of those tabs
23   directly in line with either a perpendicular or a
24   parallel buckle or bulge?
                                                      66

1    A. No.
2    Q. Was it your opinion that the missing tabs
3    in the general field of the roof as you observed
4    during your first inspection were blown off by the
5    wind?
6    A. There is no doubt.
7    Q. Exhibit B to your first report is weather
8    data for the month of May 2004?
9    A. Yes.
10   Q. How far back did you search for weather
11   information?
12   A. I don't recall. I believe this may have
13   corresponded with the data loss reported.
14   Q. But as you sit here today, you have no
15   recollection of going back and looking for the one
16   year or two-year period prior to May 27 of 2004?
17   A. No. No.
18   Q. And what is significant about the weather
19   information for the month of May 2004?
20   A. Well, this information was specifically
21   included in the report to show that the maximum
22   wind speeds and maximum wind gusts were
23   significantly lower than the wind speed that
24   Hatteras warranties.
                                                      67

1    Q. The 110 miles per hour?
2    A. Correct.
3    Q. Are you aware of any day between the date
4    in which the roof shingles were installed and May
5    27 of 2004 in which there was a recorded wind speed
6    in or around the Village of Arlington Heights to be
7    in excess of 110 miles per hour?
8    A. I'm aware of none.
9    Q. So can we agree that in this particular
10   case, you had tabs being blown off by wind speeds
11   below that for which the shingles were designed and
12   waranteed to withstand?
13   A. Yes.
14   Q. Are you aware of any day subsequent to
15   April 27 of 2004 and the date of your last
16   inspection, December 27, 2006, in which there was a
17   recorded wind speed in or around the Village of
18   Arlington Heights in excess of 110 miles per hour?
19   A. No.
20   Q. Did you observe any additional missing
21   tabs during your second or third inspection?
22   A. I did not do a specific count. But my
23   sense was that the number of tabs missing was
24   essentially the same.
                                                      68

17   (Pages 65 to 68)

1    Q.  What is the impact of missing tabs in
2  terms of weather protection?
3    A.  Well, it's relatively minimal.  Normally,
4  a missing tab will not result in leaks; although,
5  it does expose a nail, which could be a conduit.
6  That's essentially it, other than cosmetics.
7    Q.  Well, we have more than one missing tab
8  here, right?
9    A.  True.
10    Q.  So we have more than one exposed nail
11  head?
12    A.  The only point I'm making is a missing tab
13  as opposed to the loss of an entire shingle is
14  relatively minimal as far as detrimental effect.
15    Q.  Well, explain the difference.  So you're
16  saying that -- is there a difference between one --
17  let me start over.
18      If you look at Exhibit Number 17, which is
19  one shingle, correct, one Hatteras shingle you see
20  the four tabs.  Are you saying that simply having
21  one -- I guess in your opinion, is there a
22  difference from a weather protection standpoint
23  between one missing tab versus three or four
24  missing tabs?
                                              69

1    A.  Quite frankly, if you're only talking
2  about the tab portion, it's very minimal detriment
3  because you still have coverage.  You still have
4  water shedding capability.  If you lose the entire
5  shingle, which is the back portion, now you have a
6  more serious situation.  But as long as you've only
7  lost a tab, that's an 18-inch shingle with an
8  8-inch exposure, so you lose an 8-inch tab, you
9  still have coverage below it of the underlying
10  course.  Water will still shed off of that roof.
11    Q.  Exhibit Number 10 from Kurt Yearwood's
12  deposition shows how many tabs missing?
13    A.  Three.
14    Q.  Three tabs.  So how many nail heads are
15  exposed?
16    A.  Three.
17    Q.  Three nail heads?
18    A.  Yes.
19    Q.  Why would it not be more?
20    A.  There would be a nail head directly over
21  cut out of each of these shingles.  There is
22  another nail here covered, and one here that's
23  covered, but that's 1, 2, 3 exposed.
24    Q.  These shingles have a useful life of 40
                                              70

1  years?
2    A.  No.  The manufacturer offers a 40-year
3  warranty against manufacturer's defects, but you
4  should never assume that you're going to achieve a
5  40-year life out of it.
6    Q.  What is the useful life of this type of
7  shingle?
8    A.  I would estimate that you would assume
9  you'll get 20 years of life out of it.  You may get
10  25, but I would not assume that.
11    Q.  What are some of the conditions that
12  impact the useful life of a shingle?
13    A.  Steepness of the roof, the height,
14  exposure.
15    Q.  Exposure, meaning?
16    A.  When I say height, a four-story building,
17  if everything else around it is only 2 stories, it
18  has more exposure to the elements.  The quality of
19  the shingle, obviously, the quality of the
20  installation, whether or not it's properly
21  maintained, lots of factors.
22    Q.  These particular shingles, if we go to the
23  application instructions attached to your first
24  report, I'll use Exhibit A-3 as an example.  The
                                              71

1  shingles, basically, are such that in the top
2  diagram, the bottom row or bottom course would be
3  the first course that would be laid and then you
4  work your way up?
5    A.  Right.
6    Q.  So that second course would be laid on top
7  of the first?
8    A.  Correct.
9    Q.  Third on top of the second and so on as we
10  go up the --
11    A.  Yes.
12    Q.  Correct?
13    A.  Correct.
14    Q.  And then the shingles are designed to lay
15  flat on top of each other?
16    A.  Of course.
17    Q.  And consistent with its purpose of
18  performing as a weather resistant barrier, you
19  would want to have no visible gaps between the
20  courses, correct?
21    A.  Obviously, they are supposed to lay flat.
22  That's what everybody expects.
23    Q.  And you want to have no visible gaps
24  between the courses, because if you had visible
                                              72

18  (Pages 69 to 72)

1 gaps, then that will impact performance as to the
2 weather resistant barrier, correct?
3   A. Well, a gap in and of itself is not really
4 going to allow water through. You still have a
5 situation -- keep in mind, this is a not a
6 waterproof roof system. It is a water shedding
7 roof system. The fact that you have a gap does not
8 mean the water is going to get under it.
9       As I said before, you've only got 8-inch
10 exposure on an 18-inch shingle. You still have
11 plenty of coverage. You also have underlayments
12 below it. So a gap in and of itself will not
13 necessarily effect its weather tightness.
14   Q. Are you supposed to have visible gaps
15 between courses?
16   A. You obviously want it to lay flat, but you
17 mentioned its weather tightness, and I'm saying a
18 gap will not necessarily effect its weather
19 tightness.
20   Q. So visible gaps between the courses would
21 be something contrary to what the shingle was
22 designed for?
23   A. It would be contrary to what the industry
24 would generally expect. It would not necessarily

73

1 be contrary to its ability to perform.
2   Q. Did you observe tabs that had been lifted
3 such that there was a visible gap between courses?
4   A. At some of the buckled locations, there
5 was some fairly small gaps.
6   Q. What's the greatest gap you observed?
7   A. Less than half inch.
8   Q. What is the impact of a lifted tab? By
9 lifted tab, one that has had a gap between courses
10 relative to weather protection?
11   A. As I said before, if you're talking about
12 a small gap like what we saw up there, the impact
13 on weather tightness is negligible.
14   Q. Exhibit 12 from Kurt Yearwood's deposition
15 would show -- or does show a lifted tab, correct,
16 where there is a visible gap between the courses?
17   A. That looks like a lifted tab, yes.
18   Q. Exhibit 13 from Mr. Yearwood's deposition
19 as well as Exhibit 14 also show lifted tabs,
20 correct?
21   A. I can't say for sure that these are, this
22 is lifted. I mean, this just could be
23 irregularities in the surface. That's actually not
24 very uncommon looking. Here, it looks like the

74

1 metal flashing is causing a problem with the
2 shingle. I don't know that the tab is lifted or
3 the metal flashing is just causing the problem
4 there. I actually think this one here also has to
5 do with the step flashings.
6   Q. The first photograph from Group Exhibit 18
7 from Mr. Yearwood's deposition shows what I'm going
8 to refer to you now as a humped tab or humped shingle
9 where you actually can see a bump in the tab,
10 correct?
11   A. Uh-huh.
12   Q. Yes?
13   A. Well, I can't see it too well. It looks
14 like there is some type of ridge there or buckle.
15   Q. Or buckle.
16       And then below that, there is a lifted
17 tab?
18   A. I actually don't know that. You see the
19 ridge, but I actually don't see where the tab is
20 lifted at all. It appears to be sealed tight tab.
21 You don't see the edge of the tab off the seal, off
22 of the surface of the shingles at all.
23   Q. Exhibit 19 from Mr. Yearwood's deposition,
24 and I'll put it on the back 19-A, shows a finger

75

1 lifting the tab, a tab?
2   A. Lifting the corner of a tab, yeah.
3   Q. Exhibits 15 and 16 show what I'm going to
4 refer to as a humped or ridged tab or tabs?
5   A. Okay.
6   Q. Correct?
7   A. Correct.
8   Q. And you observed that condition during all
9 of your three inspections, correct?
10   A. Yes.
11   Q. And the condition depicted in Exhibit 15
12 and 16 from Mr. Yearwood's deposition is a
13 condition other than which the tabs were designed
14 for and intended for use, correct?
15   A. Obviously, they're not supposed to be
16 ridging.
17   Q. Right, would you agree with that?
18   A. Yes.
19   Q. Did you observe the humped or ridged or
20 buckled tab condition as shown in Yearwood Exhibits
21 15 and 16 in all of the sloped roof elevation?
22   A. Many of them. Not all of them, but many
23 of them.
24   Q. Does the humped, ridged or buckled tab

76

19 (Pages 73 to 76)

1  condition as depicted in Yearwood Exhibits 15 and
2  16, does that condition have an impact in terms of
3  weather protection?
4     A. No.
5     Q. Does it have an impact in terms of useful
6  life of the shingle?
7     A. I don't think so.
8     MR. ESHOO: Let's take a few minutes, and I'm
9  going to go through his report.
10         (Whereupon a short break
11              was taken, after which the
12              following proceedings were
13              had:)
14  BY MR. ESHOO:
15     Q. If I understand your testimony, it's your
16  opinion that you can replace a missing shingle --
17  strike that.
18        It's your testimony that every place you
19  observed a missing shingle, that shingle was
20  neither in a parallel nor perpendicular humped or
21  buckled or ridged line?
22     A. That's correct.
23     Q. If your eyesight is wrong and it turns out
24  that it is, in fact, a missing shingle, is, in

77

1  fact, in a perpendicular or parallel humped ridge
2  or buckled line, would that impact the ability to
3  replace the shingle?
4     A. Well, not necessarily. We're only talking
5  about three small buckles, I mean, if somebody
6  wants to take a shingle out and put it in. And,
7  again, it has to be a contractor who is competent,
8  it should be something done --
9     Q. But we talked about earlier, you
10  acknowledged that the deck has to be in an
11  undamaged condition. And let me finish, and that
12  you don't put a shingle over a damaged deck. So if
13  you have a missing shingle over a damaged deck, why
14  would you make the repair?
15     MR. ORLANDO: Objection, mischaracterizes his
16  previous testimony.
17        You can answer.
18     MR. ESHOO: No, it doesn't.
19     THE WITNESS: The manufacturer wants you to put
20  everything over a smooth deck. Obviously, when a
21  contractor is installing the roof, the industry
22  standard says you put it over a smooth deck. We
23  have a situation on this roof where some areas have
24  buckled. So now we're in a situation with what do

78

1  you do about the buckles. They're primarily a
2  cosmetic condition. If you have a missing shingle
3  over it, is it ideal to put it over a buckle, of
4  course not, but there is no reason that you could
5  not do it. I don't think you're effecting the
6  weather tightness of the roof at all, and that's as
7  we already discussed the function of a roof
8  BY MR. ESHOO:
9     Q. Well, is there any warranty issue putting
10  a replacement shingle over a damaged deck?
11     A. What do you mean by warranty issue?
12     Q. Well, let's start from the beginning, and
13  we'll work our way up to the question. I mean,
14  there is no question in this case, we have a
15  physically damaged deck, i.e. no situation where
16  there is a buckled or bulge, we have physical
17  damage to the deck, right?
18     A. We have a buckled deck. We have
19  differential movement of the deck. I am not sure
20  that constitutes damage, cosmetic condition.
21     Q. Let me ask you this. This is a flat
22  surface?
23     A. Yes.
24     Q. If we have now a one-inch or two-inch hump

79

1  in this table, is the table damaged in your
2  opinion?
3     MR. ORLANDO: Objection, improper.
4        He is not, has not been designated as an
5  expert
6     MR. ESHOO: This is his common sense, Tom.
7     MR. ORLANDO: You can answer the question. I'm
8  stating my objection.
9  BY MR. ESHOO:
10     Q. In your opinion, if you have a one-inch
11  hump in this table, is the table in a damaged
12  condition?
13     A. It's not the same thing.
14     Q. That's not my question. I'm asking you a
15  real question. You can make whatever analogy you
16  want. That's not my question.
17        Real simple, either yes or no. In your
18  opinion, if you have a one inch hump in this table,
19  is the table damaged in your opinion?
20     A. Well, if that's --
21     MR. ORLANDO: Same objection.
22     THE WITNESS: If that's the analogy you're
23  going to make, no, because it still functions as a
24  table.

80

20 (Pages 77 to 80)

BY MR. ESHOO:

Q. So you're determining whether something is damaged based on its ability to function?

A. **Your analogy is wrong, because we don't have a buckle in the middle of the deck. We have two pieces of deck moving differentially. It is not the same thing as a buckle in the middle of a table. As you already asked me earlier, a roof is supposed to maintain the weather tightness of the building. That buckle is not effecting that bruise of building to maintain the weather tightness of the building. We have a cosmetic issue.**

Q. So if hypothetically an airplane part drops onto a roof and creates a hole into the roof but doesn't effect its ability to keep out the weather for whatever reason, do you have a damaged roof?

A. **The roof cover has not been compromised.**

Q. You just have the damage. Do you have a damaged roof?

A. **Yeah, but it's not the same thing. You gave an analogy.**

Q. You answered my question.

MR. ORLANDO: Don't cut off the witness.

81

THE WITNESS: I will explain. You just described a scenario where a hole is put through the roof cover. We do not have a scenario where there is a hole in the roof.

BY MR. ESHOO:

Q. But in my example I just gave you, if an airplane part drops out and causes a hole in the roof --

A. **That's a bad analogy.**

Q. -- is that physical damage?

A. **It's not the same thing.**

Q. Is it physical damage?

A. **If there is a hole in the roof?**

Q. Yeah.

A. **Which is what we don't have in this situation.**

Q. Is it physical damage?

A. **If there is a legitimate hole in the roof. We don't have a hole in the roof.**

Q. So there is no damage in this particular case, because all we have is buckling or bulging, but no holes?

A. **We have a cosmetic concern.**

Q. So this would be an acceptable condition

82

for your home?

A. **It's acceptable in the sense that it will maintain weather tightness.**

Q. So it's an acceptable condition in your home?

A. **From a weather tight standpoint, sure.**

Q. So you would live with that condition?

A. **I got news for you, people live in that condition. Drive through the suburbs, you see that everywhere.**

Q. I'm not asking about other people. I'm asking you. I'm asking you. Okay? And I want you to look to the jury at trial and tell the jury or the finder of fact in this case, that, yep, these types of buckles and buldges and ridges in a roof would be perfectly acceptable for me.

MR. ORLANDO: Objection, argumentative. Totally improper question.

BY MR. ESHOO:

Q. Yes or no?

MR. ORLANDO: You're badgering the witness.

MR. ESHOO: I haven't started yet.

THE WITNESS: You don't have the roofing material compromised. You asked me if you can

83

associate.

BY MR. ESHOO:

Q. If the roof covering is compromised, then it would be damaged, correct?

A. **If it was compromised.**

Q. It would be damaged?

A. **If it was compromised.**

Q. I understand that.

A. **But it's not.**

Q. I understand that. But your opinion is that I understand what your opinion is, but your testimony is that if the roof covering is compromised, then it is physically damaged. I understand you disagree that it is compromised, but conceptually, if the roof covering is compromised, it's physically damaged?

MR. ORLANDO: Objection, form. You can answer.

BY MR. ESHOO:

Q. Would you agree with that statement?

A. **If it is compromised in the sense that the roofing cover is damaged, yeah. We don't have a scenario where the roof cover is damaged at those buckles.**

Q. Well, that's the dispute in this case, so

84

1  I mean, your opinion is your opinion. All I'm
2  asking you is, which I think you said already, just
3  to confirm, if the roofing covering is compromised,
4  then it's physically damaged?
5      MR. ORLANDO: I'm going to object to the form
6  of the question. Do you understand what he means
7  by compromised? If you don't, ask him.
8      THE WITNESS: Why don't you elaborate on what
9  you mean by compromised.
10 BY MR. ESHOO:
11     Q. Well, you already answered that it wasn't
12 compromised in this case, so you understood what
13 the question meant.
14     A. Why are you asking me again?
15     Q. I just want to confirm the statement is
16 that if a roof, the generic statement, if a roof
17 covering is compromised, then it's physically
18 damaged?
19     MR. ORLANDO: Object to the form of the
20 question. Vague and ambiguous as to compromised.
21         Answer the question.
22     THE WITNESS: If it is compromised, I will
23 clarify, it is damaged in the sense that there is a
24 hole, tear, it could no longer maintain the weather

85

1  tightness of the roof, of course it is damaged. In
2  this case, we've got a cosmetic condition.
3  BY MR. ESHOO:
4      Q. The person that went out, the roofing
5  contractor in December, what's his background,
6  training and experience in roofing?
7      A. I just know that he works for KAP Roofing.
8      Q. How did you pick him?
9      A. He was referred to me by a commercial
10 contractor that I do an extensive amount of work
11 with, largest commercial contractor in Chicago who
12 uses KAP Roofing for all of their steep slope work,
13 so they're more than capable of handling a job of
14 this complexity and size.
15     Q. Would you agree that if a replacement
16 shingle is applied to the areas of this roof where
17 there are missing shingles, that you will have a
18 mismatch?
19     A. No.
20     MR. ORLANDO: First of all, I'm going to object
21 to the premise of the question, missing shingles,
22 but go ahead.
23     MR. ESHOO: What do you mean he has already
24 testified to missing shingles? You're right.

86

1  You're right. That's my mistake. I should be very
2  specific with my words. Everybody else is
3  BY MR. ESHOO:
4      Q. If you apply a tab to where there are
5  missing tabs, will you not have a mismatched
6  situation?
7      A. If you have to replace a tab, you're going
8  to take the full shingle and replace it with a new
9  shingle. And it's a common practice that happens
10 all the time, every day. Just because you've got a
11 missing shingle doesn't mean you can't replace it.
12 And it's commonly done without anybody being able
13 to tell any cosmetic difference.
14     Q. But in this particular case, you're going
15 to have in numerous areas throughout the roof
16 elevations at least an 18-inch by 36-inch area in
17 which you're going to have a shingle that will not
18 match with the surrounding shingles?
19     A. First of all, it's only 8-inch by 36-inch,
20 but, again, it's an extremely small percentage of
21 the roof. It's a common practice that happens all
22 the time. And I highly doubt from the ground you
23 will be able to tell on this particular roof.
24     Q. Well, whether it's acceptable or not is

87

1  not the point. The point is you're going to have
2  an 8-inch by 36-inch area throughout the roof
3  elevation where there is going to be a mismatch
4  between that shingle and the surrounding shingles,
5  right?
6      A. I didn't say there was going to be a
7  mismatch. You haven't seen whether there is a
8  color variation. This is a common product. It's
9  not new. They still make the same color. Even
10 minor dye variations are not necessarily
11 noticeable, and I highly doubt on this particular
12 building anyone will be able to tell from the
13 ground. And, again, it's a completely common and
14 accepted practice.
15     Q. Are the shingle tabs designed to be
16 subjected to a 1-inch fluctuation?
17     A. This is an extremely heavyweight shingle.
18 It's designed to meet certain A.S.T.M. requirements
19 for tear resistance, and it well exceeds them, so
20 it can accommodate them without any problem.
21     Q. So what study are you relying upon that
22 says that a one inch pushing up of a shingle is
23 acceptable?
24     A. I'm not referring to any study. I'm

88

22  (Pages 85 to 88)

1 telling you.
2     Q. You just referenced some --
3     A. I referenced the --
4     Q. What A.S.T.M. standard are you relying
5 upon that says a 1-inch shingle being pushed up is
6 acceptable?
7     A. I can't tell you the test process that
8 A.S.T.M. goes through.
9     Q. I don't care about their process. Give me
10 the name and/or the number of the A.S.T.M. standard
11 that supports your belief that subjecting a shingle
12 to a 1-inch pushing up is acceptable?
13     A. I can probably give you the number. Do
14 you have the technical report that you had before?
15     It's A.S.T.M. D3462.
16     Q. Now, Mr. Hable was not present during your
17 first inspection, correct?
18     A. No.
19     Q. And did he ever read this report?
20     A. Yes.
21     Q. Did he make any changes to it?
22     A. I don't recall. I doubt it.
23     Q. But he certainly signed off on it?
24     A. Yes.
        89

1     Q. And he applied his seal and the firm's
2 seal?
3     A. Yes.
4     Q. And the only reason that there is a firm
5 seal is because of him?
6     A. Not necessarily, but I mean certainly he
7 is the factor, yeah.
8     Q. What?
9     A. He is the engineer of record at the time.
10     Q. Did you discuss with him the -- well,
11 strike that.
12     Before he even read your report, did he
13 even know that you were going out to do this
14 inspection?
15     A. I don't recall.
16     Q. You don't recall any specific
17 conversation?
18     A. I wouldn't normally discuss it with him in
19 advance.
20     Q. So in all likelihood, he had no knowledge
21 of this project or your inspection until he read
22 the report?
23     A. Possibly not.
24     Q. He certainly didn't direct you in terms of
        90

1 how to go about doing the inspection, did he?
2     A. No.
3     Q. That would not have been the custom and
4 practice back at that point in time?
5     A. There was no structural aspect to the --
6 if there had been, he would have.
7     Q. That was not my question. He did not
8 direct you relative to this particular project and
9 it would not have been the custom and practice for
10 him to direct you relative to this project?
11     A. Not for this type of project, no.
12     Q. In 2004, who were registered or licensed
13 professional engineers in the State of Illinois?
14     A. Ed Hable.
15     Q. Anybody else?
16     A. Frank Balistreri was an architect.
17     Q. So the only professional engineer that was
18 licensed in the State of Illinois was Ed Hable?
19     A. Correct.
20     Q. Just so we're clear, you did not act under
21 Mr. Hable's direction and supervision in relation
22 to this project, correct?
23     A. Correct.
24     Q. On Exhibit Number 2, whose name is that
        91

1 handwritten?
2     A. Frank Balistreri.
3     Q. Why did he sign it?
4     A. I assume he signed it because he is the
5 president of the company and he decided to sign it
6 underneath our corporate seal, actually I don't
7 recall.
8     Q. Would he have been the managing agent in
9 charge of the engineering activities in the State
10 of Illinois?
11     A. I suppose.
12     Q. That's why he signed it?
13     A. As president, yeah.
14     Q. In terms of your first report, page 1, the
15 date of loss is May 27, 2004?
16     A. That's what it says.
17     Q. And what was the source of that
18 information?
19     A. I would have gotten that from St. Paul
20 Traveler's Insurance.
21     Q. Did you ever speak with Mr. Harman
22 relative to this project?
23     A. I certainly spoke to him when he gave us
24 the assignment.
        92

23 (Pages 89 to 92)

1    Q.  But after that?
2    A.  I don't recall.
3    Q.  Do you recall when you actually mailed
4  this report to Harman?
5    A.  In all likelihood, it would have gone out
6  the day that it is dated.
7    Q.  What was Mr. Baldus' purpose for being at
8  the inspection?
9    A.  Well, he is a field assistant, and he
10  would have been available if we needed to take
11  measurements or do core samples or do some type of
12  assistance with ladders or things like.  However
13  since Mansfield was there, he didn't really have to
14  do much at all.
15    Q.  The roof statistics/characteristics, the
16  source of that information was whom?
17    A.  That was gathered in the field and from
18  the architect's plans.
19    Q.  Page 3.  First full paragraph says, this
20  past spring members of the association began
21  noticing other concerns for the shingle roof
22  system.  Do you have a time frame other than the
23  spring?
24    A.  No.

93

1    Q.  Who was the source of that information?
2    A.  Probably Kurt Yearwood.
3    Q.  And the last paragraph before observations
4  on page 3, it says, the purpose of the meeting was
5  to inspect the roof and determine a cause and
6  extent of the steep slope roof damages.  The damage
7  is referring to the buckling and bulging decking as
8  well as the bulging or humping of the shingles?
9    A.  It refers to all of the items that were
10  listed in the paragraph before that had been
11  observed by the association.
12    Q.  So?
13    A.  So it had to do with --
14    Q.  Did the steep slope roof damages include
15  missing shingles?
16    A.  Yes.
17    Q.  Would include lifted shingles?
18    A.  Yes.
19    Q.  Would include what I've been referring to
20  as the humped shingles?
21    A.  Yes.
22    Q.  As well as the buckling or bulging of the
23  plywood decking?
24    A.  Yes.

94

1    Q.  Now, in the last paragraph of page 3,
2  you're talking about the closed cut valles.  What
3  are you referring to, if you have a photograph,
4  please show me.
5    A.  It's where two fields come together.  For
6  instance, photo 12 of exhibit 26 is a valley.
7    Q.  And you referenced that cement was used in
8  those vallies?
9    A.  Correct.
10    Q.  Is that the only place that cement was
11  used?
12    A.  Well, I mentioned that it was used in the
13  vallies, because that is manufacturer's requirement
14  for this particular shingle, it's possible they
15  could have used cement somewhere else, but they
16  would not be required to do so.
17    Q.  In fact, when we looked at the one
18  document Exhibit 18, we're talking about the figure
19  1, it refers to roofing cement under the shingles
20  for roof slopes greater than 21:12?
21    A.  Which does not apply to this group.
22    Q.  Right
23    A.  Correct.
24    Q.  The first full paragraph on page 4 before

95

1  shingled condition, the last sentence, the
2  contractor stated that the architect's design for
3  underlayment was followed.  Did you accept that
4  statement and do you have any reason to dispute
5  that?
6    A.  I'm sorry, where are you?
7    Q.  Page 4, last sentence in the first full
8  paragraph before it says the shingled conditions,
9  it says the contractor stated that the architects
10  design for underlayment was followed?
11    A.  I simply accepted it, because we weren't
12  in a position to remove all the shingles.
13    Q.  Do you have any reason as you sit here
14  today to doubt that statement?
15    A.  No.
16    Q.  Let me see if I can summarize some of your
17  report.  Generally, speaking, you identified three
18  possible or potential design and/or construction
19  defects?
20    A.  I believe that's correct.
21    Q.  And one is improper installation of the
22  plywood panels due to the lack of an H clip or
23  spacer clip between the panels?
24    A.  Well, that was part of.

96

24  (Pages 93 to 96)

1    Q.   All I want to do is, as I understand your
2  report, you identify three possible or potential
3  design and/or construction defects. One of them
4  potentially or possibly would be improper
5  installation of the plywood panels based on the
6  lack of an H clip or spacer clip between the
7  panels?
8    A.   I did mention that, yes.
9    Q.   And second possible potential design
10 and/or construction defect would be inadequate
11 ventilation within the roof attic, which is the
12 enclosed area beneath the other side of the plywood
13 nails?
14   A.   Correct.
15   Q.   And the third possible or potential design
16 or construction defect would be improper design of
17 the roof framing system based on use of steel
18 rafters to which the plywood panels were installed?
19   A.   Correct.
20   Q.   And each of those possible or potential
21 design and/or construction defects would require
22 the rendering of an engineering opinion, would they
23 not?
24   A.   No, not really.  We can certainly see

97

1  anyone that's involved in construction understands
2  the purpose and the need for H clips.  Anyone
3  involved in construction and certainly, I have had
4  high extensive training in ventilation.  I can show
5  you that, so I can certainly make that assessment.
6  And anyone who is studying construction can
7  understand differential movement between steel and
8  wood materials due to expansion and contraction.
9    Q.   Well, we've already established that the
10 report, your report, is a technical submission,
11 correct?
12   A.   There are technical concepts.  That
13 doesn't necessarily relate to engineering.
14   Q.   But it's a technical submission?
15   A.   Semantics.  The code is real clear what is
16 acceptable for ventilation.  Anybody that can read
17 should be able to figure that out, quite frankly.
18 H clips were called for by the architect, and they
19 weren't put in as far as we can see.  That's
20 technical in that sense, but I don't know the fact
21 why anything that is technical has to be an
22 engineering record.
23   Q.   Well, the professional engineering act of
24 1989 says all technical submissions prepared by or

98

1  under the personal supervision of a professional
2  engineer shall bear that professional engineer's
3  seal and license expiration date.  So we know that
4  the seal was done in this particular case, but
5  we've also established that this technical
6  submission was not prepared by or under his
7  supervision, right?
8    A.   Again, you would have to define, I guess,
9  what you mean by technical submission.  If based on
10 on what you're telling me there, you're telling me
11 this type of submission has to have structural
12 implications, and I don't agree with that.  It
13 doesn't change the findings of the report.
14   Q.   Technical submissions is defined as
15 designs, drawings, and specifications which
16 established a standard of quality for materials,
17 workmanship, equipment, and a construction systems,
18 studies and other technical reports prepared in the
19 course of a design professional's practice.
20       So to the extent you're establishing
21 standard of quality for the materials of
22 workmanship which you've already testified that
23 this report does, then it's a technical report.  So
24 you have a technical report that was sealed by a

99

1  licensed professional engineer that was not
2  prepared under his supervision, so, basically, you
3  were practicing professional engineering without a
4  license?
5        MR. ORLANDO:  Don't answer that question.
6  There are so many objections to that question.  But
7  make your motion.
8  BY MR. ESHOO:
9    Q.   We will.  We will be making a motion.  Do
10 you know that that carries civil and criminal
11 penalties, practicing engineering without a
12 license; do you know that?
13       MR. ORLANDO:  Objection, don't answer that.
14 BY MR. ESHOO:
15   Q.   Why?  What's wrong with that?
16       MR. ORLANDO:  This is totally inappropriate --
17 you've got the factors you need.  Make whatever
18 motion you deem is relevant.
19 BY MR. ESHOO:
20   Q.   What does Mr. Hable do now?
21   A.   He is retired.
22   Q.   Last paragraph of page 7.  You state that
23 currently the buckling is primarily a cosmetic
24 problem; however, with time, it may elevate to a

100

25  (Pages 97 to 100)

1   more serious concern. The buckling may eventually
2   cause damage to the shingles and/or the
3   underlayment felt. How would it cause damage to
4   the shingles and/or the underlayment felt?
5      A.  If the buckling were to get appreciably
6   worse, and we're talking about some significant
7   movement, then I don't have a crystal ball, but
8   it's possible something could tear or crack. Based
9   on my inspection two plus years later, we see no
10  real appreciable difference from what we saw the
11  first time. I saw no damage to the shingles. So I
12  would state that it is primarily a cosmetic concern
13  and continues to be the case.
14     Q.  Well, what you're saying then is that the
15  buckling poses a risk of future physical loss or
16  damage?
17     A.  It could.
18     MR. ESHOO:  Give me a couple of minutes, and I
19  think I'm about done.
20          (Whereupon a short break
21           was taken, after which the
22           following proceedings were
23           had:)
24  BY MR. ESHOO:

101

1   roof, so I can't imagine that on a 10:12 roof water
2   is going to be able to back up under that.
3      Q.  What about ice damming?
4      A.  Ice damming is a phenomenon that may
5   happen down at the eve, and it has happened at the
6   eve, but they have 6 feet of ice and water shield,
7   so they shouldn't have any problems.
8      Q.  Here is an example of a photograph in
9   which you can see the icing condition. I'll mark
10  this as 18-F from Kurt Yearwood's deposition;
11  right?
12     A.  I'm seeing ice on the roof.
13     Q.  So you're seeing ice, so that is what
14  actually could result in some type of ice damming
15  effect where you're going to get water under a
16  shingle if it's an area where there is a hump or a
17  ridge and a gap, correct?
18     A.  Well, Richard, you're seeing a picture of
19  ice. That's not an ice damn.
20     Q.  But it's going to melt and refreeze
21  possibly over time, right?
22     A.  For it to actually backup and go uphill,
23  you need a pretty substantial damn. That's going
24  to happen at the eve. It's not going to happen in

103

1      Q.  If Kurt Yearwood testified that during the
2   June 2004 inspection either yourself or the
3   Mansfield people conveyed to him that the ridge or
4   hump in the shingles was anywhere between a half
5   inch to 3 inches, would he be wrong?
6      A.  I don't recall anyone saying that. There
7   certainly is no area that looks like 3 inches.
8      Q.  So is it your testimony that the humped or
9   buckled condition of the shingles is not putting
10  any increased stress on the shingles?
11     A.  Well, certainly there is stress related to
12  it, but I don't believe that the stress is to a
13  point where it's going to cause damage to the
14  shingles. I did not see any shingles that had been
15  damaged as a result of it.
16     Q.  Does that increased stress make the tab
17  more susceptible to premature deterioration?
18     A.  No.
19     Q.  Does the fact that you have a -- I think
20  you said one inch hump or ridge in the shingles
21  effect its ability to shed snow and water as
22  readily as it would if it was laying flat against
23  the course below?
24     A.  Water is still going to shed off a 10:12

102

1   the field of roof. It's not likely on a 10:12. If
2   it went under the shingles a little bit, big deal,
3   you've got an 8-inch course exposure with an
4   18-inch wide shingle overlapping the underlying
5   course and the underlayment felt below that. It's
6   not going to result in leaks.
7      Keep in mind, this is a water shedding
8   roof. It's not a waterproof roof. No one ever
9   claimed it would be waterproof. I don't think this
10  picture shows anything of consequence.
11     Q.  Would you agree that the humped or ridged
12  condition is a permanent condition?
13     A.  It's, in all likelihood, it may vary a
14  little bit, but it's probably not going to go back
15  down.
16     Q.  So it's permanent?
17     A.  Essentially, yes.
18     Q.  So the height of the hump or the ridge may
19  vary depending on whether you have expansion or
20  contraction during the respective seasons, but that
21  condition is always going to be there until some
22  fix is made, correct?
23     A.  Correct.
24     Q.  And would you agree that this continued

104

26  (Pages 101 to 104)

1  expansion and contraction relative to the hump or
2  ridge of the shingles potentially subjects the tab
3  to cracking?
4     A. Depending on how severe it gets, it could.
5  All I'm saying is within the past two years, I
6  don't see where it has gotten worse. And it's
7  certainly not at a point now where I would expect
8  any cracking to occur.
9     Q. Well, you don't have a crystal ball,
10  right?
11     A. I don't have a crystal ball, but it would
12  take some very substantial lifting for a shingle of
13  this weight and quality to tear from that type of
14  stress.
15     MR. ESHOO: That's all I have.
16     MR. ORLANDO: No questions. We'll reserve.
17     THE REPORTER: Did you want to order the
18  transcript?
19     MR. ESHOO: I do.
20     THE REPORTER: Did you need any minis or
21  ASCIIs?
22     MR. ESHOO: Just a mini.
23     MR. ORLANDO: Regular, mini, and ASCII.
24     THE REPORTER: Will you handle signature?

105

1     MR. ORLANDO: Yeah
2     AND FURTHER DEPONENT SAITH NAUGHT
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

106

1     IN THE UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF ILLINOIS
2     EASTERN DIVISION
3
  BOARD OF MANAGERS OF VAIL  )
4  AVENUE CONDOMINIUM   )
  ASSOCIATION, and VAIL  ) No. 06 CV 2098
5  AVENUE CONDOMINIUM   )
  ASSOCIATION,   )
6     Plaintiffs,  )
    vs.   )
7  THE TRAVELERS INDEMNITY   )
  COMPANY OF CONNECTICUT,   )
8     Defendant.  )
9
10     This is to certify that I have read the
11  transcript of my deposition taken in the
12  above-entitled cause by LAURA M. O'BRIEN, Certified
13  Shorthand Reporter, on the 6th day of February,
14  2007, and that the foregoing transcript accurately
15  states the questions asked and the answers given by
16  me as they now appear.
17
   _____
18      LOUIS JUHLMANN
  SUBSCRIBED AND SWORN TO
19  before me this _____, day
  of _____ 2007.
20
   Notary Public
21
22
23
24

107

1  STATE OF ILLINOIS )
   ) SS:
2  COUNTY OF C O O K )
   I, LAURA M. O'BRIEN, a notary public
3  within and for the County of Cook County and State
  of Illinois, do hereby certify that heretofore,
4  to-wit, on the 6th day of February 2007, personally
  appeared before me, at 515 North State Street,
5  Illinois, LOUIS JUHLMANN, in a cause now pending
  and undetermined in the Circuit Court of Cook
6  County, Illinois, wherein BOARD OF MANAGERS OF VAIL
  AVENUE CONDOMINIUM ASSOCIATION, and VAIL AVENUE
7  CONDOMINIUM ASSOCIATION is the Plaintiff, and THE
  TRAVELERS INDEMNITY COMPANY OF CONNECTICUT is the
8  Defendant.
   I further certify that the said witness
9  was first duly sworn to testify the truth, the
  whole truth and nothing but the truth in the cause
10  aforesaid; that the testimony then given by said
  witness was reported stenographically by me in the
11  presence of the said witness, and afterwards
  reduced to typewriting by Computer-Aided
12  Transcription, and the foregoing is a true and
  correct transcript of the testimony so given by
13  said witness as aforesaid.
   I further certify that the signature to
14  the foregoing deposition was not waived by counsel
  for the respective parties.
15     I further certify that the taking of this
  deposition was pursuant to Notice. and that there
16  were present at the deposition the attorneys
  hereinbefore mentioned.
17     I further certify that I am not counsel
  for nor in any way related to the parties to this
18  suit, nor am I in any way interested in the outcome
  thereof.
19     IN TESTIMONY WHEREOF: I have hereunto set
  my hand and affixed my notarial seal this _____
20  day of _____, 2007
21
22
   _____
23    NOTARY PUBLIC. COOK COUNTY. ILLINOIS
24

108

27 (Pages 105 to 108)

1    STATE OF ILLINOIS   )
                        )  SS:
2    COUNTY OF C O O K   )
            I, LAURA M. O'BRIEN, a notary public
3    within and for the County of Cook County and State
     of Illinois, do hereby certify that heretofore,
4    to-wit, on the 6th day of February 2007, personally
     appeared before me, at 515 North State Street,
5    Illinois, LOUIS JUHLMANN, in a cause now pending
     and undetermined in the Circuit Court of Cook
6    County, Illinois, wherein BOARD OF MANAGERS OF VAIL
     AVENUE CONDOMINIUM ASSOCIATION, and VAIL AVENUE
7    CONDOMINIUM ASSOCIATION is the Plaintiff, and THE
     TRAVELERS INDEMNITY COMPANY OF CONNECTICUT is the
8    Defendant.
            I further certify that the said witness
9    was first duly sworn to testify the truth, the
     whole truth and nothing but the truth in the cause
10   aforesaid; that the testimony then given by said
     witness was reported stenographically by me in the
11   presence of the said witness, and afterwards
     reduced to typewriting by Computer-Aided
12   Transcription, and the foregoing is a true and
     correct transcript of the testimony so given by
13   said witness as aforesaid.
            I further certify that the signature to
14   the foregoing deposition was not waived by counsel
     for the respective parties.
15          I further certify that the taking of this
     deposition was pursuant to Notice, and that there
16   were present at the deposition the attorneys
     hereinbefore mentioned.
17          I further certify that I am not counsel
     for nor in any way related to the parties to this
18   suit, nor am I in any way interested in the outcome
     thereof.
19          IN TESTIMONY WHEREOF:  I have hereunto set
     my hand and affixed my notarial seal this ___
20   day of __Marin__, 2007.
21
22
            _Laura M. O'Brien_
23   _____
     NOTARY PUBLIC, COOK COUNTY, ILLINOIS
24

                                              108